# IN THE SUPREME COURT OF IOWA

No. 17–1901

Filed May 24, 2019

**STATE OF IOWA,**

Appellee,

vs.

**KENNETH L. LILLY,**

Appellant.

---

Appeal from the Iowa District Court for Lee County, Mary Ann Brown, Judge.

The defendant appeals his conviction for first-degree robbery, challenging the jury pool and the sufficiency of the evidence to convict him. **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven and Andrew Prosser, Assistant Attorneys General, and Clinton Boddicker, County Attorney, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This appeal of a conviction for aiding and abetting a bank robbery requires us to consider the defendant's rights to an impartial jury under the Sixth Amendment to the United States Constitution and article I, section 10 under the Iowa Constitution, as well as the sufficiency of the evidence to sustain the defendant's conviction. The defendant, an African-American, was convicted following a jury trial in North Lee County. His jury contained no African-Americans. Nor were there any African-Americans in the jury venire that reported that day. The defendant, relying on our recent decision in *State v. Plain*, 898 N.W.2d 801 (Iowa 2017), attempted to establish a violation of his constitutional rights by presenting documentary evidence and testimony regarding jury pools in North Lee County and jury management practices followed in North Lee County and the Iowa Judicial Branch as a whole. The district court concluded that his effort fell short.

On our review, we reject the defendant's challenges to the sufficiency of the evidence. However, because we have made further elaboration and refinement of our analysis in *Plain*, we conditionally affirm and remand for further proceedings consistent with this opinion.

### II. Facts and Procedural Background.

At approximately 10:11 a.m. on June 29, 2016, the Fort Madison Police Department received a 911 call reporting an apparent robbery in progress at the Fort Madison Bank and Trust. The caller, Joseph Hardin, had been waiting to cash a check at the bank's drive-through window. A man exited from the car in front of him and entered the bank with a mask pulled over his face. Hardin then heard what sounded like a gunshot, and a bank employee waved at Hardin to drive away. While on the phone with

the police, Hardin recounted details about the passenger who had stepped out of the car and entered the bank, but he could neither identify the car's driver nor remember any specifics about the car.

Within minutes, police arrived at the bank. The robber, later identified as Lafayette Antonio Evans, spotted one of the police cars. He ran out of the bank through the back exit with a haul of cash in a zip-tie bag. Following a police chase and an exchange of gunfire, Evans was fatally shot. Investigators found a mask, a semiautomatic handgun, and a hand-held radio on Evans's person.

The defendant, Lilly, was the uncle of Evans's wife. Before the robbery, Lilly's wife had received a money order from Evans's mother. According to a witness present at the bank, a Suburban-type vehicle had dropped off Evans at the bank. This witness noticed a black fan had been clipped to the rear-view mirror of the Suburban. She also observed that the driver was a large African-American man, a general description that fit Lilly.

After seeing a Suburban parked outside of Lilly's home, the police executed a search warrant on the vehicle on July 7. A black fan was found in Lilly's Suburban along with a citizens band (CB) radio capable of communicating with the hand-held radio recovered from Evans.

When investigators interviewed Lilly, he stated that Evans had been staying with him until leaving his residence the night before the robbery. Lilly also claimed to have slept until about 10:30 a.m. or 11:00 a.m. the morning of the robbery on June 29, and then run some errands by himself and driven to Rockford, Illinois. Lilly added that Evans had free use of Lilly's vehicle while staying with Lilly.

Video surveillance from local businesses disproved Lilly's account of his whereabouts on June 29. It established that Lilly had been at a

convenience store in town at 8:39 a.m., at a hardware store in town at 9:23 a.m., and at a McDonald's near the bank at 10:14 a.m., just minutes after the 911 call reporting the robbery. Lilly also had on his person a receipt for buying a drink at the McDonald's with a 10:15 a.m. imprint. In addition, the convenience store video showed a passenger in the Suburban who was wearing a white shirt, the same color as the shirt that Evans wore when he committed the robbery later that morning.

Lilly was arrested on October 26 and charged in the North Lee County District Court with aiding and abetting first-degree robbery under Iowa Code sections 703.1, 711.1, and 711.2. He entered a plea of not guilty on November 18. On September 14, 2017, Lilly, an African-American, filed a motion challenging the jury pool as not a fair cross section of the community. He pointed out that no one who answered a jury questionnaire for that pool identified himself or herself as African-American. All but three who disclosed their race responded that they were "White" or "Caucasian," and of those three, one self-identified as "Asian," one as "Other," and the third as "White/Black." Lilly also noted that according to the 2013 United States census, 3.2% of the Lee County population was African-American. The court conducted an evidentiary hearing on Lilly's challenge, receiving testimony from Dawn Willson, a judicial specialist responsible for picking the names for jury service in North Lee County, and Mark Headlee, the information technology director for the Iowa Judicial Branch. The court also received exhibits, including the last five years of "race reports" from North Lee County jury pools.

On September 25, the court denied Lilly's motion. It concluded that "the defendant has failed to establish . . . that any underrepresentation of African-Americans on the list is due to a systematic exclusion of the group in the jury selection process." Jury selection began the following day, and

no African-American jurors were seated in the jury of six men and six women.

In its initial jury instructions before opening statements, the district court gave the following instruction on implicit bias:

> Reach your verdict without discrimination. In reaching your verdict, you must not consider the defendant's race, color, religious beliefs, national origin or sex. You are not to return a verdict for or against the defendant unless you would return the same verdict without regard to his race, color, religious beliefs, national origin or sex.[1]

After the State finished its case-in-chief, Lilly moved for a judgment of acquittal. The court denied the motion. Lilly renewed his motion for acquittal at the close of evidence, which the court again denied. The court gave the same implicit-bias instruction in its final instructions.

On September 29, the jury found Lilly guilty of robbery in the first-degree. On November 22, the court denied Lilly's motion for new trial and sentenced him to twenty-five years in prison subject to a 70% mandatory minimum. *See* Iowa Code §§ 902.9(1)(*b*), .12(1)(*e*) (2016). Lilly appealed, and we retained the appeal.

On appeal, Lilly contends the racial composition of the jury pool violated his rights to an impartial jury under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. He contends the evidence was insufficient that he aided and abetted Evans in the robbery of the bank. He also contends he received ineffective assistance of counsel when his counsel failed to move for a judgment of acquittal as to first-degree robbery based on the lack of evidence that he knew a firearm would be used in the robbery.

---

[1]This was the precise instruction that had been requested in *Plain.* 898 N.W.2d at 816. Although we held the district court did not abuse its discretion in failing to give that instruction, we stated that "[w]e strongly encourage district courts to be proactive about addressing implicit bias . . . ." *Id.* at 817.

### III.  Standard of Review.

"We review constitutional issues de novo."  *Plain*, 898 N.W.2d at 810. We also review ineffective-assistance-of-counsel claims de novo.  *State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017).  "However, when the claim is that counsel was ineffective in failing to move for judgment of acquittal, this implicates the question whether such a motion would have been meritorious, which turns on the sufficiency of evidence."  *State v. Henderson*, 908 N.W.2d 868, 874–75 (Iowa 2018).

Sufficiency of the evidence claims are reviewed for corrections of errors at law.  *See* Iowa R. App. P. 6.907; *see also Harris*, 891 N.W.2d at 186.  In making determinations regarding the sufficiency of the evidence, we "view the evidence in the light most favorable to the state, regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence." *Harris*, 891 N.W.2d at 186 (quoting *State v. Jones*, 281 N.W.2d 13, 18 (Iowa 1979)).  If the record contains substantial evidence to support the defendant's conviction, we will uphold a trial court's denial of a motion of acquittal.  *Id.*  "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *Id.* (quoting *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008)).  Evidence can be either circumstantial or direct, or both.  *Id.*  Evidence is substantial if a reasonable trier of fact would be convinced that the defendant is guilty beyond a reasonable doubt.  *Henderson*, 908 N.W.2d at 875.

### IV.  Analysis.

**A. Composition of the Jury Pool.**  Lilly, an African-American, challenges the composition of the jury pool in North Lee County from

which his jury was selected.[2]  None of the jurors who heard his case was African-American.  Of the pool from which his jury was selected, one person marked "Other" on the questionnaire, one marked "Asian," and one marked "White/Black."  None of them, however, were part of the venire from which Lilly's jury was chosen.[3]

Before trial, a hearing was held in which Lilly was given the opportunity to show that African-Americans were being systematically underrepresented in North Lee County jury pools.  Lilly presented "race reports" for the last five years of jury pools from late 2012 to late 2017 in North Lee County.  The reports showed that on the approximately 2789 questionnaires returned during the last five years, only fourteen potential jurors self-reported as being African-American.  Approximately 30% of respondents did not disclose their race.

In 2013, Lee County had a 3.2% African-American population; in 2016, that figure was 3%.  No statistics were presented regarding North Lee County.  The State noted below, and reiterates here, that the African-American population in Iowa is, on average, younger than the overall population.  It estimates that 75.83% of Iowans are eighteen years or older, and thus eligible to be jurors, whereas only 65.4% of African-American Iowans are eighteen or older.

1. *The Duren/Plain framework.*  In *State v. Plain,* we considered a challenge under the Sixth Amendment to the racial composition of a jury

---

[2]In this opinion, we are attempting to be consistent with the definitions used in chapter 607A of the Iowa Code.  *See* Iowa Code § 607A.3.  Thus, "pool" refers to the jurors summoned to the courthouse for a particular time period; "panel" refers to the jurors summoned to a particular courtroom to serve, potentially, on a jury for a specific trial. *See id.* § 607A.3(7), (9).

[3]The record does not indicate how many jurors were in that jury pool.  Wilson testified she sends out questionnaires to 125 randomly selected names for each pool but it is not clear how many responses were received.  The typical number of responses appears to have ranged from 75 to 115.

pool. 898 N.W.2d at 821. We noted that the Sixth Amendment "right to an impartial jury entitles the criminally accused to a jury drawn from a fair cross-section of the community." *Id.* We explained that under *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664 (1979), a defendant can establish a prima facie violation of the fair-cross-section requirement by showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 822 (quoting *Duren*, 439 U.S. at 364, 99 S. Ct. at 668).

We noted that to establish the second *Duren* prong "jurisdictions generally apply one or more of the following statistical tests: (1) absolute disparity, (2) comparative disparity, and/or (3) standard deviation." *Id.* Absolute disparity is calculated by subtracting the percentage of the minority group in the jury pool from the percentage in the community. *Id.* We faulted the absolute disparity test for failing to "account for the relative size of the minority group in the general population." *Id.* at 823. For example, if absolute disparity is set at 10% and the minority group is less than 10% of the relevant population, the defendant would never be able to meet the absolute disparity test, even if the system for selection of jury pools were biased against that minority group. *See id.*

"Comparative disparity is calculated by dividing the absolute disparity by the percentage of the population represented by the group in question." *Id.* We criticized that test because "it can overstate underrepresentation for groups with a small population percentage." *Id.* For example, if a pool of 100 jurors contains two members of a minority group but the percentage of members of that minority group in the relevant

community is 3%, this translates into a comparative disparity of 33 1/3%, even though this result would be a relatively common outcome of a random process.

The final test, standard deviation, uses accepted statistical methods to determine the likelihood that a disparity between the minority percentage in the pool and in the population is the result of something *other than* chance. *See id.* These statistical methods are commonly used in employment discrimination cases. *See, e.g., Pippen v. State*, 854 N.W.2d 1, 20 (Iowa 2014) (noting that the plaintiffs "point out that the racial disparity in the hiring of applicants deemed qualified for the job by DAS was statistically significant."). In *Plain*, we said that standard deviation was also "imperfect" because

> [m]easures of the standard deviation presume randomness; however, the chances of drawing a particular jury composition are not random, in part because "the characteristics of the general population differ from a pool of qualified jurors."

*Plain*, 898 N.W.2d at 823 (quoting *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1163 (9th Cir. 2014) (en banc)).

We decided in *Plain* to overrule *State v. Jones*, 490 N.W.2d 787, 792–93 (Iowa 1992), to the extent it held that absolute disparity was the appropriate test to use. *See id.* at 826. We concluded that "[p]arties challenging jury pools on the ground that they are unrepresentative may base their challenges on multiple analytical models." *Id.* at 827. We added, "Because what constitutes a fair cross-section of the community is a fluid concept, a flexible approach for determining when a racial disparity rises to the level of a constitutional violation is warranted." *Id.*

Further, we held that defendants are entitled to "access to the information necessary to prove a prima facie case." *Id.* at 828. We conditionally affirmed Plain's conviction and remanded to the district court

"for development of the record on the Sixth Amendment challenge." *Id.* 829.

In this case, Lilly attempted to prove up a challenge using the *Duren/Plain* framework. He brought his challenge under both the Sixth Amendment and article I, section 10 of the Iowa Constitution, which like the Sixth Amendment provides a right to trial before "an impartial jury."

The district court concluded that it was unable to decide whether the second *Duren/Plain* prong had been met, and therefore focused on the third prong. There, it reasoned:

> Even if the jury panels are not representative of the African-American population in the community, in order for the defendant to challenge the panel he must still prove that the underrepresentation is due to a systematic exclusion of the group in the jury selection process. The evidence at the hearing disclosed that jury managers for all jury panels chosen in the state of Iowa use a system created by the judicial branch under the direction of the State Court Administrator. The decision has been made by the State Court Administrator that those jury managers are only able to access lists created from voter registration lists supplied by the Iowa Secretary of State and driver's license and DOT identification lists supplied by the Iowa Department of Transportation. This court and the North Lee County jury manager have no choice in which lists are utilized. Consequently, the court sees no purpose will be served by granting the defendant's prayer for relief to strike this jury panel and have the jury manager call in another panel using the same lists. Based upon the past five-year history, there's very little likelihood that a newly-drawn jury panel would include individuals who on their questionnaires identify themselves to be African-Americans. It's more likely than not that a new panel would contain just the same representation of African-Americans as the current panel.
>
> Redrawing the panel would not be expected to change the outcome. If the system is flawed, the system for drawing panels in the entire state is flawed.
>
> . . . .
>
> No evidence has been presented to this court that there is any other list available that could be used in a systematic random selection process that would increase the representation of African-Americans on the jury list. What other readily available and discernable list of names is

available? What more could those creating the list do to increase the number of African-Americans on the list? Without that information even being discussed, there is no evidence that the underrepresentation of African-Americans is due to a systematic exclusion of the group in the jury selection process.

On appeal, Lilly reasserts his challenges to the jury pool under the *Duren/Plain* framework. Although Lilly raises both Federal and State Constitutions in his briefing, he does not advance a separate Iowa constitutional analysis. As we have said,

> When a party does not suggest a framework for analyzing the Iowa Constitution that is different from the framework utilized under the United States Constitution, we apply the general federal framework. However, we reserve the right to apply the federal framework in a different manner.

*In re Det. of Anderson*, 895 N.W.2d 131, 139 (Iowa 2017). Accordingly, we will apply the *Duren/Plain* three-part test under the Iowa Constitution, reserving the right to apply it differently.

2. *Fair and reasonable representation.* Both Lilly and the State ask us to provide more clarity on the second prong. Lilly observes that *Plain* "does not answer the question of how to utilize the three statistical tests—particularly in minority populations that are extremely small in the community." The State likewise points out that *Plain* "offered no further guidance" beyond telling district courts they could rely on all three tests. This, according to the State, has "created considerable uncertainty," and the State urges us "to provide guidance on how to analyze the resultant statistics." In other words, both parties ask us to go beyond what we said in *Plain*.[4]

---

[4]The parties seem to be channeling the views of a judge who concurred in the judgment when the United States Court of Appeals for the Ninth Circuit, like our court, overruled precedent holding that the absolute disparity test should be the only analytical measure used in fair-cross-section challenges:

> We owe the district courts more direction than a survey of statistical measures to solve this problem. While the discussion of available tests may aid the district courts in choosing a fitting measure for

On further reflection, we believe that the determination of whether minority representation is "fair and reasonable in relation to the number of such persons in the community" ought to be performed by accepted statistical methods. *See Plain*, 898 N.W.2d at 822 (quoting *Duren*, 439 U.S. at 364, 99 S. Ct. at 668). Neither absolute disparity nor comparative disparity is such a method. As Lilly puts it, absolute disparity "understates the disparity" and comparative disparity "overstates the results." *See People v. Luong*, 378 P.3d 843, 850 (Colo. App. 2016) ("Absolute disparity tends to understate a small group's underrepresentation on jury panels, while comparative disparity tends to overstate it."). By contrast, standard deviation analysis appears to get at the heart of the matter—i.e., "the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance." *Berghuis v. Smith*, 559 U.S. 314, 324 n.1, 130 S. Ct. 1382, 1390 n.1 (2010).

Moreover, we are not sure the criticism of standard deviation we voiced in *Plain* is entirely correct. It is true that this statistical method "presume[s] randomness." *Plain*, 898 N.W.2d at 823. Rather than being a flaw of the method, though, we see that as the method's strength. It enables judges to determine whether there has been a deviation *from* randomness that would indicate a problem. It is also potentially true that "the characteristics of the general population differ from a pool of qualified

---

a given fair cross-section challenge, the majority still provides no standard to evaluate minority exclusion. With only discussion, the district courts are left with at least these questions: In what circumstances would the district court consider statistics from a particular test? Should it apply more than one test? If so, which ones? If it were to evaluate multiple tests, which would be controlling? What outcomes under any test or tests would constitute a legally intolerable exclusion?

*Hernandez-Estrada*, 749 F.3d at 1174–75 (N.R. Smith, J., concurring in the judgment).

jurors." *Id.* (quoting *Hernandez-Estrada,* 749 F.3d at 1163). However, as the State observes, the one established difference is that the African-American population tends to be younger and therefore may contain fewer qualified jurors. It is possible to adjust for this difference, as the State proposes, or alternatively not to adjust for it, which would actually make it easier for an African-American defendant to meet the second prong. This does not make the standard deviation method invalid.

In *Berghuis,* the Supreme Court likewise characterized the standard deviation test as "imperfect." 559 U.S. at 329, 130 S. Ct. at 1393. Yet the only reason it deemed the test imperfect was not a substantive one, but simply the fact no court "has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *Id.* (alteration in original) (quoting *United States v. Rioux,* 97 F.3d 648, 655 (2d Cir. 1996)). Again, this is not really a flaw in the method.[5]

The State asks us to adopt an initial screen of a 3% absolute disparity before resorting to accepted statistical methods. The State says this will screen out cases that do not involve "*substantial* underrepresentation" and "allow judges to dispose of meritless cross-section challenges more efficiently, with minimal math."[6] We decline to do

---

[5]By contrast, the *Berghuis* Court gave a *substantive* reason why the absolute and comparative disparity tests were also "imperfect," namely, that they can be "misleading" when members of the distinctive group comprise only a small percentage of those eligible for jury service. *Berghuis,* 559 U.S. at 329, 130 S. Ct. at 1393. And of course, the reason why those tests can be misleading when applied to groups making up a small percentage of eligible jurors is the greater likelihood that the sample won't be *statistically significant.* In other words, the need for statistics that have real meaning underlies the Supreme Court's criticisms of both the absolute and the comparative disparity tests.

[6]The State argues that the second *Duren/Plain* prong requires proof of "substantial underrepresentation," not merely some underrepresentation. To be clear, prong two of *Duren* actually requires the defendant to prove the representation in the juror pool was not "fair and reasonable in relation to the number of persons in the community." 439 U.S. at 364, 99 S. Ct. at 668. The term "substantial" comes from a

so. Any absolute disparity test has the same defect we noted in *Plain*, namely, that it gives a free pass to systematic underrepresentation so long as the absolute underrepresentation that the system produces falls below a certain threshold. We have an academic discipline that separates random occurrence from systematic underrepresentation; that discipline is statistics. Accordingly, under article I, section 10, we believe the second *Duren/Plain* factor should instead focus on whether there has been a statistically significant underrepresentation of the minority in a jury pool or pools.

As the United States Court of Appeals for the Sixth Circuit has said, "[C]omparing . . . racial percentages is of little value to this court." *Jefferson v. Morgan*, 962 F.2d 1185, 1189 (6th Cir. 1992). *Jefferson* quoted from an earlier Fourth Circuit case, which put the matter well:

> When a litigant seeks to prove his point exclusively through the use of statistics, he is borrowing from another discipline, mathematics, and applying these principles to the law. In borrowing from another discipline, a litigant cannot be selective in which principles are applied. He must employ a standard mathematical analysis. Any other requirement defies logic to the point of being unjust. Statisticians do not simply look at two statistics, such as the actual and expected percentage of blacks on a grand jury, and make a subjective conclusion that the statistics are significantly different.

*Id.* (quoting *Moultrie v. Martin*, 690 F.2d 1078, 1082 (4th Cir. 1982)).

In *Castaneda v. Partida*, the Supreme Court held that a habeas corpus petitioner had proved a prima facie case of Fourteenth Amendment

---

pre-*Duren* Fourteenth Amendment equal protection case. *Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S. Ct. 1272, 1280 (1977). In *Jones*, though, we indicated that "substantial underrepresentation" is part of the prima facie case under the Sixth Amendment and article I, section 10. *Jones*, 490 N.W.2d at 793. In *Plain*, we used the *Duren* term "fair and reasonable" to describe the second prong. *Plain*, 898 N.W.2d at 826–27. We will continue that practice here. Our purpose in this part of the opinion is to describe what the defendant must prove to establish that representation of the group in the jury pool was not "fair and reasonable."

discrimination in grand jury selection that was not rebutted by any evidence in the record.  430 U.S. 482, 501, 97 S. Ct. 1272, 1283 (1977). The record showed that 79.1% of the population was Mexican-American, but the average number of Mexican-American grand jurors over a period of years was only 39%.  *Id.* at 495, 97 S. Ct. at 1280.

> If the jurors were drawn randomly from the general population, then the number of Mexican-Americans in the sample could be modeled by a binomial distribution.  Given that 79.1% of the population is Mexican-American, the expected number of Mexican-Americans among the 870 persons summoned to serve as grand jurors over the 11-year period is approximately 688.  The observed number is 339.  Of course, in any given drawing some fluctuation from the expected number is predicted.  The important point, however, is that the statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value.  The measure of the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (here 870) times the probability of selecting a Mexican-American (0.791) times the probability of selecting a non-Mexican-American (0.209).  Thus, in this case the standard deviation is approximately 12.  As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.  The 11-year data here reflect a difference between the expected and observed number of Mexican-Americans of approximately 29 standard deviations.  A detailed calculation reveals that the likelihood that such a substantial departure from the expected value would occur by chance is less than 1 in 10140.

*Id.* at 496 n.17, 97 S. Ct. at 1281 n.17.

The State picks up on *Castaneda*'s reference to "two or three standard deviations" and proposes a threshold of 1.64 standard deviations, which is less.  According to the State, when applied in only *one* direction, i.e., to deviations that are *below* the expected mean, this would lead to a 95% confidence level that the underrepresentation cannot be a matter of chance.  Social scientists typically consider two standard

deviations in *either* direction to be statistically significant, a level at which there is a 95% probability the discrepancy cannot be due to chance. *See Jones v. City of Boston,* 752 F.3d 38, 46–47 & n.9 (1st Cir. 2014).

The NAACP, as amicus curiae, contends that these levels are too high; however, the NAACP does not suggest an alternative. On our review, we conclude the threshold should be one standard deviation—in other words, the percentage of the group in the jury pool must be one standard deviation or more below its percentage in the overall population of eligible jurors. As we understand it, when the variance is one standard deviation, there remains a 32% probability that we are seeing a random event. But if we are looking in only one direction, as we are in these cases, the probability would be 16% that the departure is a random event and 84% that it is not.

Although one standard deviation is less than the two standard deviations customarily employed to measure statistical significance, we think this lower threshold can be justified. As we discuss below, the defendant still must trace the disparity to some practice or practices.

A related question is how to calculate the percentage of the minority group in the population for baseline purposes. The State contends that the most current census data available at the time of the trial should be used. The NAACP agrees. So do we.

In addition, the State maintains that the data should be adjusted to reflect the population that would actually be eligible for jury service. It therefore argues that the relevant percentage should be that of the minority group in the *eighteen-or-older* population. *See United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir. 2009) ("To analyze whether African Americans were fairly and reasonably represented in the jury pool, we compare the difference between the percentage of African Americans in

the population eligible for jury service and the percentage of African Americans in the pool."); *United States v. Torres-Hernandez*, 447 F.3d 699, 703–04 (9th Cir. 2006) ("Our precedents agree that to prove Hispanics are underrepresented in a given district's jury pools, the ultimate basis for comparison is the district's actual percentage of jury eligible Hispanics."); *see also Jones*, 490 N.W.2d at 793 ("When considering group or total population figures, eligible juror statistics would provide the more relevant figures."). The NAACP agrees with this concept. For example, it acknowledges that in a county where the inmates of a state prison make up a significant portion of the population, those inmates should be removed from the calculation, because state prisoners are not eligible for jury service. We agree with this concept as well, while sharing the NAACP's view that this "is not a matter for hasty determination" but for "carefully developed" proof.

This proof can be developed on remand. For example, although we know that the Iowa State Penitentiary is located in Fort Madison, we do not know how the presence of the prison affects the baseline percentage of African-Americans in the eligible juror population. Rather than engage in our own research, we should allow the parties to present evidence. When presented with different data, the district court should rely on "the statistical data that best approximates the percentage of jury-eligible" persons in the distinctive group. *Torres-Hernandez*, 447 F.3d at 704.

The State also argues against using "aggregated data." That is, the State insists our review should be limited to the pool from which the trial jurors were drawn, without considering other, earlier pools. We are not persuaded. It is unfair to restrict the defendant to the current jury pool that may have as few as seventy-five persons, and then at the same time require the defendant to furnish results that have a certain degree of

statistical significance.  *See Commonwealth v. Arriaga*, 781 N.E.2d 1253, 1263 (Mass. 2003) ("A defendant must present evidence of a statistically significant sample, usually requiring analysis of the composition of past venires.").  What the parties cannot do, of course, is tip the scales in an aggregate analysis by including some earlier jury pools but not other, more recent jury pools.

Finally, we agree with the State that the defendant must show that he or she has suffered a constitutional wrong, although we may define that wrong somewhat differently.  A defendant whose jury pool has a percentage of the distinctive group at least as large as the percentage of that group in the jury-eligible population has not had his or her right to a fair cross section infringed, and there would be no reason to aggregate data in that event.

3. *Systematic exclusion.*  Turning to the third *Duren/Plain* prong, the undisputed evidence is that the Iowa Judicial Branch currently uses two lists to develop its juror pools—driver's licenses and nonoperator identifications from the department of transportation, and voter registrations from the secretary of state.  Lilly argues that other lists could be used—such as income tax filers, persons receiving unemployment, and persons on housing authority and child support recovery lists.  Lilly contends that even when these do not have additional names, they may have more up-to-date addresses.  However, Lilly does not explain how failure to use such lists in itself amounts to "systematic exclusion" within the meaning of *Duren/Plain.*

The NAACP takes a different approach.  It argues that when the underrepresentation is severe enough, the court should relieve the defendant from proving the third *Duren/Plain* factor and instead shift the burden "to the State to establish that its jury management practices have

been reasonably calculated, in light of known best practices and available technology, to secure an impartial jury."

Although the NAACP argues that *Plain* approved this type of burden-shifting, we are not convinced. We said in *Plain,* "[T]he defendant must show evidence of a statistical disparity over time *that is attributable to the system for compiling jury pools.*" 898 N.W.2d at 824 (emphasis added).[7]

Clearly, federal law requires the defendant to show causation, that is, that the underrepresentation is produced by some aspect of the system. In *Berghuis*, the Court noted that

> Smith's list includes the County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the refusal of Kent County police to enforce court orders for the appearance of prospective jurors.

559 U.S. at 332, 130 S. Ct. at 1395. Still, in a unanimous opinion, the Court emphasized that it was not enough to "point[] to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Id.* In a recent decision, the United States Court of Appeals for the Ninth Circuit used like-minded reasoning in rejecting a reasonable cross-section claim:

> Llerenas's expert testified generally that "there's something systematic going on that's . . . causing underrepresentation of Hispanics or Latinos," but he was unable to identify what that "something" was and relied only on statistical evidence. Where a defendant offers "nothing more than a simple

---

[7]We also quoted a law student note in *Plain* for the following point: "If there is a pattern of underrepresentation of certain groups on jury venires, it stands to reason that some aspect of the jury-selection procedure is causing that underrepresentation." 898 N.W.2d at 824 (quoting David M. Coriell, Note, *An (Un)fair Cross Section: How the Application of* Duren *Undermines the Jury*, 100 Cornell L. Rev. 463, 481 (2015)). However, his quotation about what "stands to reason" should not be taken as a suggestion that we were eliminating the third prong of the prima facie case. To the contrary, we repeatedly noted that the defendant had the burden to establish systematic exclusion, not merely underrepresentation. *See id.* at 822–24.

disparity between the percentage of Hispanics in the venire and in the County," he has not met his burden to show that the disparity was systematic.

*United States v. Llerenas*, 743 F. App'x 86, 89 (9th Cir. 2018) (second quote *Randolph v. People*, 380 F.3d 1133, 1142 (9th Cir. 2004)).

Similarly, the California Supreme Court has declined to find systematic exclusion based on a county's decision not to adopt a list of practices alleged to improve minority juror representation, absent proof that they actually would improve minority juror representation. *See People v. Henriquez*, 406 P.3d 748, 763–64 (Cal. 2017). In *Henriquez*, the defendant faulted the county's exclusive reliance on department of motor vehicles and voter registration lists, rather than weaving in other sources such as utility service lists. *Id.* at 763. The defendant also faulted the county's past failure to conduct aggressive follow-up on jurors who did not appear. *Id.* at 764. The California Supreme Court was not persuaded, noting,

> [D]efendant has made no showing that the county's use of the DMV and voter registration lists was the probable cause of the disparity he challenges, nor has he shown that any other available list would have produced a jury venire that was more representative of the population.

and,

> [D]efendant has not shown that the county's failure to engage in more aggressive follow-up is a cause of underrepresentation of African-Americans in the jury pool . . . .

*Id.* at 763–64. The court thus unanimously affirmed the defendant's convictions and death penalty. *Id.* at 782.

An analogy can usefully be drawn between the proof required in employment discrimination cases and the proof required to establish systematic exclusion under *Duren/Plain*. The analogy is not perfect but it sheds some light. In both instances, the challenger does not need to show

purpose or intent to discriminate. Nonetheless, statistically significant disparities alone are not enough. Rather, the challenger must tie the disparity to a particular practice. *Pippen*, mentioned above, was a disparate impact employment discrimination case. 854 N.W.2d at 4. There, we affirmed a class action judgment in favor of the State. *Id.* The plaintiffs—although undeniably able to show statistically significant disparities in rates of hiring—failed to connect those hiring disparities to one or more employment practices or, alternatively, to show that the elements of the hiring process were "not capable of separation for analysis." *Id.* at 19–23.

Hence, at this time, we are not prepared to embrace the NAACP's proposal. We are reluctant to impose an open-ended obligation on lower courts to follow unspecified "known best practices," whatever those best practices may turn out to be. We may be willing to impose such an obligation in the future when we have more data about what those practices are and their effectiveness.

Yet, we do hold today that jury management practices can amount to systematic exclusion for purposes of article I, section 10. *Berghuis* appears to reject this proposition under the Sixth Amendment, suggesting that "hardship exemptions" and other items on Smith's list might fall within a State's permissible "discretion." *Berghuis*, 559 U.S. at 333, 130 S. Ct. at 1395. For article I, section 10 purposes, we disagree. We adopt instead the approach put forward by Paula Hannaford-Agor:

> Although the socioeconomic factors that contribute to minority underrepresentation in the jury pool do not systematically exclude distinctive groups, the failure of courts to mitigate the underrepresentation through effective jury system practices is itself a form of systematic exclusion.
>
> Litigants alleging a violation of the fair cross section requirement would still have to demonstrate that the

> underrepresentation was the result of the court's failure to practice effective jury system management. This would almost always require expert testimony concerning the precise point of the juror summoning and qualification process in which members of distinctive groups were excluded from the jury pool and a plausible explanation of how the operation of the jury system resulted in their exclusion. Mere speculation about the possible causes of underrepresentation will not substitute for a credible showing of evidence supporting those allegations.

Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 Drake L. Rev., 761, 790–91 (2011). If a practice that leads to systematic underrepresentation of a distinctive group in jury pools can be identified and corrected, there is no reason to shield that practice from scrutiny just because it is relatively commonplace. At the same time, the defendant must prove that the practice has caused systematic underrepresentation.

In sum, we hold today that run-of-the-mill jury management practices such as the updating of address lists, the granting of excuses, and the enforcement of jury summonses can support a systematic exclusion claim where the evidence shows one or more of those practices have produced underrepresentation of a minority group.

Because the parties did not have the benefit of these refinements to the *Duren/Plain* standards, we have decided today to follow the same course of action as in *Plain*. *See* 898 N.W.2d at 829. That is, we will remand this case to give Lilly a further opportunity to develop his arguments that his Sixth Amendment and article I, section 10 rights to an impartial jury were violated. If the district court concludes a violation occurred, it shall grant Lilly a new trial.

**B. Sufficiency of the Evidence.** Lilly also challenges the sufficiency of the evidence supporting his conviction for aiding and

abetting Evans in the bank robbery. Lilly argues the evidence does not demonstrate he drove Evans to the bank and, even if it did, the evidence does not show he was aware of Evans's intent to rob the bank.

We will sustain an aiding-and-abetting conviction if the record contains "substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *State v. Tyler*, 873 N.W.2d 741, 750 (Iowa 2016) (quoting *State v. Spates*, 777 N.W.2d 770, 780 (Iowa 2010)). "Aiding and abetting may be proven by direct or circumstantial evidence. Direct and circumstantial evidence are equally probative." *State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017) (citations omitted).

1. *Substantial evidence that Lilly drove Evans to the bank.* We believe there was substantial evidence that Lilly drove Evans to the bank. Evans had been staying with Lilly. An eyewitness at the bank said the driver was "a larger black man who kind of filled the seat." Lilly is six feet, six inches tall and weighs 285 pounds. The car was identified as a Suburban-type vehicle, the same type of car as Lilly's, and it had a black fan, as did Lilly's. It is true that the color of Lilly's vehicle did not match that in either of the eyewitness descriptions (which in turn differed from each other in their recollection of the vehicle's color). Yet video shows Lilly in his vehicle purchasing a soda at a nearby McDonald's shortly after the robbery. Furthermore, Lilly initially told investigators that he had been asleep at home when the robbery occurred. This was false. Video later showed that he had been driving in his vehicle to a convenience store and a hardware store prior to the robbery and that he had a passenger with him. Lilly also had a CB radio in his Suburban capable of communicating with Evans's hand-held radio.

2. *Substantial evidence that Lilly knew Evans intended to rob the bank.* We also believe there is substantial evidence that Lilly was aware Evans intended to rob the bank. Evans had a mask around his neck before entering the bank. Hardin's wife, who was in the car with him, remarked that Evans was "probably going to rob the bank." Evans pulled the mask over his face upon entering the bank. Evans was also wearing gloves and tape on his hands to cover distinguishing tattoos. There is no evidence showing Evans putting on the gloves or applying the tape inside or outside the bank. Thus, a jury could infer he was wearing them while still in the vehicle, even though it was late June. Moreover, Evans used a zip-tie bag to carry the stolen money from the robbery. Witnesses testified to seeing Evans carrying a cinch-bag when he exited the vehicle.

**C. Ineffective Assistance of Counsel.** Lilly argues his trial counsel was ineffective in failing to move for acquittal specifically on *first-degree* robbery because there was insufficient evidence Lilly knew Evans was going to use a dangerous weapon during the robbery. We have said that "no reasonable trial strategy could permit a jury to consider a crime not supported by substantial evidence." *State v. Schlitter*, 881 N.W.2d 380, 390 (Iowa 2016). Thus, the ultimate issue is the sufficiency of the evidence supporting the first-degree robbery conviction. *Henderson*, 908 N.W.2d at 874–75. If evidence was sufficient to support the conviction, the motion would have been meritless, and Lilly cannot demonstrate that his counsel was ineffective.

Under the dangerous weapon alternative for first-degree robbery, "the state must prove the alleged aider and abettor had knowledge that a dangerous weapon would be or was being used." *Id.* at 876. The evidence was sufficient here. Evans left the vehicle and walked into the bank in possession of the .40 handgun which he used to rob the bank. Assuming

the jury found Lilly had driven Evans to the scene of the robbery, it was entitled to conclude he knew about the handgun.

This case differs from *Henderson*, on which Lilly relies. In *Henderson*, the defendant had been assigned to serve as the getaway driver for a robbery from a pharmacy. *Id.* at 870. In the planning leading up to the robbery, it had been discussed that the two robbers would use a threatening note but not a firearm. *Id.* at 870–71, 875. After the defendant separated from the group, the robbers received the gun that was actually used in the robbery. *Id.* at 875. Here, by contrast, Lilly was the drop-off driver and it is rational to conclude he would have seen the gun in the car, just as he would have seen the mask around Evans's neck, the gloves, the tape covering his tattoos, and the cinch-bag he was carrying.[8]

**V. Conclusion.**

For the foregoing reasons, we conditionally affirm Lilly's conviction and sentence, but remand this case for further consideration of Lilly's claim that his jury was not drawn from a fair cross section of the community in violation of the Sixth Amendment and article I, section 10.[9]

---

[8]Lilly also argues that his trial counsel was ineffective in failing to call a witness from the Rivers Inn who could have testified regarding the hotel's check-in log. Counsel ran into a hearsay objection when he attempted to question one of the investigators at trial about this log. Counsel's theory was that three guests from Alabama, where Evans had previously been living, had checked in around the time of the robbery and one of them could have served as Evans's driver. We agree with the State that there is insufficient information to address this claim on direct appeal.

[9]Lilly also filed a pro se brief raising three issues. Two of them, the constitutionality of the jury pool and the sufficiency of the evidence, have already been addressed in the body of this opinion.

Lilly's third pro se claim is that he should have been granted a new trial because the verdict was contrary to the weight of the evidence. This issue has not been preserved for our review. Lilly's motion for new trial did not assert that the verdict was contrary to the weight of the evidence. Accordingly, the district court's order denying that motion did not make a determination on this issue, and we will not consider the matter for the first time on appeal. *See State v. Thompson*, 836 N.W.2d 470, 491 (Iowa 2013) (finding a weight-of-the-evidence claim that was not raised in a motion for a new trial was not preserved for review).

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Cady, C.J., and Wiggins and Appel, JJ., concur.

Waterman, Christensen and McDonald, JJ., concur as to divisions IV.B and IV.C and dissent as to division IV.A.

**APPEL, Justice (concurring specially).**

I concur with the majority opinion but write separately to illuminate my views on some of the issues raised in this case.

The right to a fair and impartial jury trial is critical to our criminal justice system.

In my view, in order for this promise to become a reality for African-Americans charged with crime in Iowa, our jury system must embrace at least four building blocks. Although only one of the building block issues is presented in this case, the question presented here can only be understood in the larger context.

First, our jury pools must represent a fair cross section of the community. Iowa Const. art. I, §§ 9, 10; *State v. Huffaker*, 493 N.W.2d 832, 833 (Iowa 1992); *State v. Brewer*, 247 N.W.2d 205, 209 (Iowa 1976). In order to achieve this goal, the pool of potential jurors must reasonably represent the make-up of the community.

As pointed out in *State v. Plain*, 898 N.W.2d 801, 825–27 (Iowa 2017), our prior precedent has not advanced the fair-cross-section requirement. By adopting an absolute disparity test in our earlier opinions, we made it virtually impossible for African-Americans and other minorities to raise fair-cross-sections claims. *Id.* In *Plain*, we abandoned the absolute disparity test and began the process of revising our approach. *Id.* at 826–27. The cases decided today constructively build on *Plain*.

Second, the manner of selecting jurors that ultimately serve from the jury pool must promote achievement of a fair cross section. We will accomplish nothing if we ensure the jury pool more fairly represents the community and then permit the jury selection process to reverse the progress. This case does not raise a question of determining how juries

are selected from the jury pool. The issue, however, is raised in the companion case of *State v. Veal*, ___ N.W.2d ___, ___ (Iowa 2019). The desirable impacts of this case in ensuring a fair cross section in the pool of jurors will be a magician's illusion if the advances made here today in ensuring a fair cross section in the jury pool are eviscerated by the process of jury selection. We want the juries that actually sit to represent a fair cross section. In order to meet that goal, we must permit effective voir dire on express *and implicit bias*. Further, we must revise our reliance on *Batson v. Kentucky*, 476 U.S. 79, 93–98, 106 S. Ct. 1712, 1721–24 (1986), in order to ensure that our fair-cross-section goals have been met. My views on *Batson* are explored in detail in my opinion in *Veal*, ___ N.W.2d at ___ (Appel, J., dissenting).

Third, Iowa lawyers must be permitted to utilize the voir dire process to explore overt and implicit racial bias. No one claims that such a process is foolproof, but an appropriately designed approach to voir dire may assist in identifying bias and in mitigating its effects. The voir dire issue is explored in my opinion in *State v. Williams*, ___ N.W.2d ___, ___ (2019) (Appel, J., concurring in part and dissenting in part).

Fourth, Iowa juries should be instructed, preferably at the beginning of the case, on implicit bias. In my view, such an instruction fairly reflects the law and provides an important protection to ensure that juries decide cases based on the facts and law and not on preconceived, anchored notions of human behavior. This issue is raised in *Williams*, ___ N.W.2d at ___, where I argue that the district court erred in failing to give the implicit-bias instruction.

I now turn to the building block issue raised in this case. An essential part of the right to a jury trial is that selection of the jury comes from a representative cross section of the community. *Taylor v. Louisiana*,

419 U.S. 522, 528, 95 S. Ct. 692, 697 (1975). As noted by the Massachusetts Supreme Judicial Court, the right to a trial by a jury drawn from a fair cross section of the community serves the critical purposes of guarding against the exercise of arbitrary power and making available the commonsense judgment of the community. *Commonwealth v. Soares*, 387 N.E.2d 499, 511 (Mass. 1979), *abrogated in part on other grounds as stated in Commonwealth v. Robertson*, 105 N.E.3d 253, 265 n.10 (Mass. 2018). When an identifiable segment of the community is excluded from a jury, the effect is to remove from the jury the range of human experience and its unique perspective on human events. *See Peters v. Kiff*, 407 U.S. 493, 503–04, 92 S. Ct. 2163, 2169 (1972).

The court's opinion represents a significant step toward addressing the fair-cross-section issue that is of critical importance in our criminal justice system. In *State v. Jones*, 490 N.W.2d 787, 793–94 (Iowa 1992), we uncritically relied upon snippets in two United States Supreme Court cases, *Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S. Ct. 824, 829 (1965), *overruled in part by Batson*, 476 U.S. at 92–93, 106 S. Ct. at 1720–21, and *Castaneda v. Partida*, 430 U.S. 482, 495–96, 97 S. Ct. 1272, 1280–81 (1977). We concluded, erroneously, that the passages stood for the proposition that under the United States Constitution the proper approach to fair-cross-section claims required application of a ten percent absolute disparity test. *Id.*

The *Jones* court then, without analysis, simply pasted the analysis of federal caselaw onto analysis of fair-cross-section claims under article I, section 10 of the Iowa Constitution. *See id.* But because Iowa has relatively low minority populations, the practical effect of the ruling in *Jones* was to eliminate any fair-cross-section protection for African-Americans under the Iowa Constitution. The fair-cross-section approach

to article I, section 10 in *Jones* was easy to administer, quite efficient, achieved apparent uniformity with what the *Jones* court erroneously understood to be required by federal law, and used the erroneous interpretation to slam the door on fair-cross-section claims for African-Americans under the Iowa Constitution in nearly all circumstances. *Plain*, 898 N.W.2d at 822.

It took us twenty-five long years to correct the *Jones* mistake. But correct it we have. In *Plain*, we recognized that *Jones* "mistakenly" relied upon United States Supreme Court precedent in endorsing the absolute disparity test. *Id.* We further recognized the importance of fair-cross-section claims in ensuring that certain minorities have at least a fair chance at representation on juries in Iowa. *Id.* at 825–26.

In this case, and in *Veal*, ___ N.W.2d at ___, we are called upon to build on the *Plain* precedent. By suggesting a one standard deviation test for prong two of the *Duren* formulation, *see Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979), the court intends to establish a fair-cross-section threshold test that is appropriately designed for Iowa and its comparatively small but distinctive populations. The test is intended to be demanding enough to net out highly attenuated claims but not so demanding that the doors of Iowa courthouses slam shut to fair-cross-section claims.

Our opinion engages in this important change under article I, section 10 of the Iowa Constitution. This is entirely appropriate. Indeed, state court decisions generally have been leaders, and not followers, in efforts to ensure the right to a fair and impartial jury. For instance, in *Aldridge v. United States*, Chief Justice Hughes relied on leading state court precedents from Florida, Mississippi, North Carolina, Texas, and California in upholding the use of voir dire to explore the possibility of

racial prejudice in a murder case in which the petitioner was African-American and the deceased was white. 283 U.S. 308, 311–13, 51 S. Ct. 470, 472 (1931). In *Jones*, we unwisely tied the Iowa Constitution to shaky Sixth Amendment precedent with no more than a conclusory phrase. 490 N.W.2d at 794. We paid the price for that and have not made the same mistake today.

But we should be careful in this case not to make the same mistake we did in *Jones*, namely, adopt a bright-line test that is easy to administer but which does not consistently serve to promote the purposes the fair-cross-section theory is designed to promote. *See id.* at 793.

There seems to be a raging debate among courts as to the best approach to determining whether the second prong of the *Duren* test has been met. Some courts still hold on to the absolute disparity method, which we have jettisoned. *See, e.g., United States v. Royal*, 174 F.3d 1, 10 (1st Cir. 1999). Other courts seem to prefer the comparative disparity method when minorities are a small component of the population. *See, e.g., Mosley v. Dretke*, 370 F.3d 467, 479 n.5 (5th Cir. 2004). Finally, some courts have utilized the standard deviation approach. *See, e.g., Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir. 1992).

Most recently, in *Berghuis v. Smith*, 559 U.S. 314, 329–30 & n.4, 130 S. Ct. 1382, 1393–94 & n.4 (2010), the United States Supreme Court declined to "take sides . . . on the method or methods by which underrepresentation is appropriately measured." Other courts have expressly eschewed choosing one method exclusively. For example, the United States Court of Appeals for the Ninth Circuit recently stated that it would not "prescribe an alternative exclusive analysis to be applied in every case." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014) (en banc). A similar approach has been followed by the

Third Circuit, which considers "evidence of absolute disparity, comparative disparity, and deviation from expected random selection." *Ramseur*, 983 F.2d at 1231. The Michigan Supreme Court also endorses the use of multiple methods. *People v. Bryant*, 822 N.W.2d 124, 136 (Mich. 2012). In *Plain*, we suggested that the district court had discretion to consider which test was most appropriate under the circumstances of each case. 898 N.W.2d at 826–27.

The court impliedly anticipates some of the criticism by embracing a relatively low standard of one statistical deviation to meet step two of *Duren*. The relatively low threshold recognizes that a more stringent statistical derivation test might net out too many claims because of its flaws in the fair-cross-section context. I am prepared to go along with this approach as a guideline, and even a presumptive guideline, but a guideline nonetheless. As has been demonstrated in *Jones*, and in the cases involving challenges to peremptory disqualification of minority jurors resulting in the progression from *Strauder v. West Virginia*, 100 U.S. 303, 309 (1879), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 536–37 & n.19, 95 S. Ct. 692, 700–01 & n.19 (1975), to *Swain* and *Batson* and, perhaps, beyond, judicial clairvoyance in the area of providing fair jury trials is limited. Our endorsement of the one standard deviation approach should not categorically rule out the possibility that other methodologies may be developed or that a party may make a persuasive case that the one standard deviation is insufficiently protective of fair-cross-section claims under the specific facts of the case. *See Garcia-Dorantes v. Warren*, 801 F.3d 584, 604 (6th Cir. 2015).

I also want to note that the court correctly adopts a flexible attitude toward implementation of the fair-cross-section doctrine. The court at present does not adopt the burden-shifting formula advanced by the

NAACP. But the court reserves revisiting the issue as our new approach to fair cross section plays out. If our approach proves to be a "crippling burden," we may need to revisit the issue. *Cf. Batson*, 476 U.S. at 92–93, 106 S. Ct. at 1721 (characterizing the burden imposed by *Swain* regarding challenges to peremptory strikes and adopting a burden shifting approach).

In addition, I want to emphasize the distinction between the fair-cross-section requirement and equal protection doctrine. Under federal law, at least, recent cases suggest that a violation of equal protection generally requires purposeful discrimination. But purposeful discrimination is not required to make a fair-cross-section claim. *See Plain*, 898 N.W.2d at 824 n.9; Nina W. Chernoff, *Wrong About the Right: How Courts Undermine the Fair Cross-Section Guarantee by Confusing It with Equal Protection*, 64 Hastings L.J. 141, 151 (2012). As we seek to develop our Iowa law on fair cross section, we should make sure we do not conflate fair cross section and equal protection concepts.

Finally, I note that this case does not present, and we do not decide, a host of additional questions associated with step three of *Duren* and *Plain*. Our laudable loosening of the absolute disparity requirement in step two will have very little impact if we erect insurmountable barriers in step three under *Duren* and *Plain*. Questions under step three include how multiple causation should be treated, whether self-exclusion of minority members impacts the analysis, and whether there should be a presumption of causation in fair-cross-section cases under some circumstances. *See* David M. Coriell, Note, *An (Un)fair Cross Section: How the Application of* Duren *Undermines the Jury,* 100 Cornell L. Rev. 463, 475 (2015). These questions await another day, but I do make the general point that erection of undue barriers to a fair-cross-section claim under

step three of the *Duren* and *Plain* tests has the potential of undermining our holdings today with respect to the second step of those tests.

In closing, for our criminal justice system to be fair to all of our citizens, we must engage in across-the-board efforts to ensure that our system of jury trials ensures fundamental fairness. The approach announced to selection of jury pools to ensure that they represent a fair cross section of the community embraced in this case is an important first step.

But it is only a first step. In my view, we must reinforce the progress made in these cases by developing a proper approach to step three of *Duren* and *Plain*, reconsidering our approach to *Batson, see Veal,* ___ N.W.2d at ___, ensuring a robust opportunity to voir dire potential jurors on potential bias, *see Williams,* ___ N.W.2d at ___, and providing the jury, at the commencement of trial and after the close of evidence, with an appropriate instruction on implied bias if requested by the defendant, *id.* If we were to address the serious issue of ensuring a fair cross section in the jury pool, but not the other important aspects of a jury trial, the progress made today may be illusory.

Wiggins, J., joins this special concurrence.

**McDONALD, Justice (concurring in part and dissenting in part).**

I concur in divisions IV.B (sufficiency of the evidence) and IV.C (ineffective assistance of counsel) of Justice Mansfield's opinion. I dissent from division IV.A of his opinion, which addresses Kenneth Lilly's fair-cross-section claim arising under the state constitution. For the reasons set forth below, I would affirm Lilly's conviction without remand. I thus respectfully concur in part and dissent in part.

## I.

At issue is the right to an "impartial jury." Article I, section 10 of the Iowa Constitution provides, "In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury . . . ." Iowa Const. art. I, § 10. The majority concludes the state constitutional right to an impartial jury includes the right to a jury pool in which any "distinctive group" is not underrepresented by more than one standard deviation from the distinctive group's percentage of the jury-eligible population if the underrepresentation is due to systematic exclusion. I disagree.

## A.

The constitutional right as constructed in the majority opinion is not on sound legal footing.

There is no textual or historical support for the proposition that the state constitutional right to an impartial jury includes the right to a jury pool drawn from a fair cross section of the community let alone the right to select a jury from a pool mathematically proportional to the jury-eligible population. Rather than conducting an independent inquiry into the meaning of our constitution, our cases have merely adopted the federal framework. But the federal framework is not supported by text or history.

*See Holland v. Illinois*, 493 U.S. 474, 480, 110 S. Ct. 803, 807 (1990) ("The fair-cross-section venire requirement is obviously not explicit in th[e] text [of the Sixth Amendment] . . . ."); *see also Berghuis v. Smith*, 559 U.S. 314, 334, 130 S. Ct. 1382, 1396 (2010) (Thomas, J., concurring) ("[The right] seems difficult to square with the Sixth Amendment's text and history."); *Duren v. Missouri*, 439 U.S. 357, 371, 99 S. Ct. 664, 672 (1979) (Rehnquist, J., dissenting) ("The Constitution does not require, and our jurisprudence is ill served, by a hybrid doctrine such as that developed in *Taylor*, and in this case."); *Taylor v. Louisiana*, 419 U.S. 522, 539, 95 S. Ct. 692, 702 (1975) (Rehnquist, J., dissenting) ("Relying on carefully chosen quotations, [the majority] concludes that the 'unmistakable import' of our cases is that the fair-cross-section requirement 'is an essential component of the Sixth Amendment right to a jury trial.' I disagree. Fairly read, the only 'unmistakable import' of those cases is that due process and equal protection prohibit jury-selection systems which are likely to result in biased or partial juries.").

Not only is the majority's interpretation atextual and ahistorical, it is also acontextual. The older Supreme Court cases upon which our precedents rely addressed widespread and state-sponsored or state-approved sexism and racism. In those cases, the systematic exclusion of large percentages of the population from civic life was stark, palpable, and easily observed. *See, e.g.*, *Duren*, 439 U.S. at 362–63, 99 S. Ct. at 667–68 (finding underrepresentation where 54% of the relevant community was women but only 15.5% served on weekly venires); *Taylor*, 419 U.S. at 524, 95 S. Ct. at 695 ("The appellee has stipulated that 53% of the persons eligible for jury service in these parishes were female, and that no more than 10% of the persons on the jury wheel in St. Tammany Parish were women."). That is not the case here. The older cases are different in kind,

not in degree. The extraction of a mathematical proportionality principle from the older cases misses the larger context in which the cases were decided and elevates logic over experience. As former Supreme Court Justice Robert Jackson wrote,

> The legal profession, like many another, tends to become over-professionalized. We forget that law is the rule for simple and untaught people to live by. We complicate and over-refine it as a weapon in legal combat until we take it off the ground where people live and into the thin atmosphere of sheer fiction.

Robert H. Jackson, *The Struggle for Judicial Supremacy: A Study of a Crisis in American Power Politics* 292 (1949).

Justice Jackson's constitutional fiction is demonstrated on the facts of this case. Here, the majority notes the African-American population for Lee County was 3% at the relevant time. Assume there was a jury pool of one hundred persons and three African-Americans were in the jury pool. In that case, the majority concedes that "[a] defendant whose jury pool has a percentage of the distinctive group at least as large as the percentage of that group in the jury-eligible population has not had his or her right to a fair cross section infringed." In other words, the claim fails as a matter of law. However, if only two African-Americans were in the same jury pool, under the majority's rule, the defendant would be entitled to significant discovery regarding the history of jury pools in the county. It seems wholly arbitrary to conclude the constitutional right to an impartial jury turns on whether a single additional member of a distinctive group out of one hundred potential jurors appears for jury service.

The constitutional text, the relevant history, and the context in which the relevant precedents were decided all militate against the majority's rule. In my view, to the extent we are going to go down this constitutional road, an appreciation of the prior evils our precedents

sought to address counsels in favor of maintaining the absolute disparity test as a threshold test to differentiate cases presenting stark, palpable, and easily observed exclusion from cases that raise only questions about the limits of our analysis and the limits of our data.

B.

The defendant's proposed constitutional calculus suffers from another complication. While mathematical precision sounds promising in theory, it is problematic in practice. The constitutional calculus assumes the existence of reliable data that can be plugged into the legal equation. However, there is no such data. The lack of reliable data makes this constitutional endeavor largely guesswork.

The record in this case demonstrates the unworkability of the rule in application. The majority cites no census data regarding the jury-eligible population in Lee County. The majority cites no census data regarding the African-American jury-eligible population in Lee County. Instead of relying on census data, the majority relies on the State's estimate that 75.83% of Iowans are eighteen years or older and the State's estimate that 65.4% of African-American Iowans are eighteen or older. The State's estimate is based on a dubious assumption regarding the flat distribution of the population across the relevant age ranges. The State's estimate is based on a further dubious assumption that state-level data regarding the age distribution for the population of Iowa as a whole is uniform from county to county. It is patently obvious the assumptions do not hold. In this particular case, the data is especially suspect. As the majority acknowledges, it is working with county-level data for Lee County. Unfortunately, Lee County is divided into two districts—North Lee County and South Lee County. There is no census information in the record regarding the jury-eligible population of North Lee County. The majority

assumes an equal distribution of races between the two districts. There is no evidence of this. Quite simply, the defendant requests, and the majority adopts, a rule that requires proportionality to a largely indeterminate comparison population.

In addition to the problems inherent in determining the jury-eligible population in all cases, there is an additional problem in the data presented in this case. There is no record establishing the percentage of African-Americans in the jury pool. The record reflects 125 jury questionnaires were sent out, but there is no evidence in this record showing how many of those were returned. Of those returned, one juror identified herself as African-American, but many others did not identify any race. Without knowing the number of people in the pool and the races of the persons who failed to identify, it is simply guesswork to determine whether this particular pool was even underrepresentative.

It was the defendant's burden to establish a prima facie case, and he failed to do so. There is thus no reason to remand the case.

## C.

The majority's rule is also impractical and burdensome. As former Chief Justice Rehnquist explained,

> No one but a lawyer could think that this was a managerially sound solution to an important problem of judicial administration, and no one but a lawyer thoroughly steeped in the teachings of cases such as *Taylor* [*v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692 (1975)], [*Califano v.*] *Goldfarb*, [430 U.S. 199, 97 S. Ct. 1021 (1977)], and *Craig* [*v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976)] could think that such a solution was mandated by the United States Constitution. No large group of people can be conscripted to serve on juries nationwide, any more than in armies, without the use of broad general classifications which may not fit in every case the purpose for which the classification was designed. The alternative is case-by-case treatment which entails administrative burdens out of all proportion to the end sought to be achieved.

> The short of it is that the only winners in today's decision are those in the category of petitioner, now freed of his conviction of first-degree murder. They are freed not because of any demonstrable unfairness at any stage of their trials, but because of the Court's obsession that criminal venires represent a "fair cross section" of the community, whatever that may be. The losers are the remaining members of that community—men and women seeking to do their duty as jurors and yet minimize the inconvenience that such service entails, judicial administrators striving to make the criminal justice system function, and the citizenry in general seeking the incarceration of those convicted of serious crimes after a fair trial.

*Duren*, 439 U.S. at 377–78, 99 S. Ct. at 675 (Rehnquist, J., dissenting).

The majority's new rule will create just as many problems as it hopes to solve. Of particular note, the majority's approach will increase the pressure to transfer venue of criminal cases with African-American defendants to urban counties to find more jury-eligible minorities. Such transfers burden already overcrowded city dockets and increase the inconvenience to the parties, victims, other witnesses, and community members who want to observe the trial. These out-of-district transfers also increase costs for the judicial branch by requiring additional travel for judges and court reporters. For the protection of the defendant, criminal cases should be tried in the county where the alleged crimes occurred, unless pretrial publicity requires a change in venue. *See State v. Rimmer*, 877 N.W.2d 652, 664–65 (Iowa 2016) (discussing history and purpose of the vicinage clause).

The problems identified by former Chief Justice Rehnquist will be particularly acute in our busier district courts. The jury managers in our more congested district courts will now be subject to discovery and subpoenaed to testify regarding jury management practices every time there is a small but immaterial variance in the racial composition of the jury pool.

Of course, administrative burden alone is not a sufficient ground to ignore a constitutional command. It is the judicial branch's obligation to interpret and apply the constitution to the facts of a particular case. It is also our special charge to continuously work to improve the administration of justice in this state. Where, as here, however, the constitutional rule is of dubious provenance and without any identifiable benefit to the fair and impartial administration of justice, the administrative burden is and should be a consideration when extending a rule that will have significant impact in the day-to-day operation of the courts.

D.

Finally, remand is not necessary because Lilly's claim fails as a matter of law.

First, the representation of the distinctive group in the jury pool (to the extent that can be determined) was fair and reasonable in relation to the number of such persons in the community. The census data shows approximately 34,000 people resided in Lee County during the relevant time. Of those, 3%, or approximately 1020 were African-American, meaning the non-African-American population was 32,980. Using the majority's estimates of eligible jurors (75.83% for all Iowans and 65.4% of African-American Iowans), there were approximately 25,008 non-African-American eligible jurors and 667 African-American eligible jurors. However, of those African-Americans eighteen years of age or older, approximately 300 were incarcerated at the Iowa State Penitentiary in Fort Madison. This is consistent with historical census information. *See* Rose Heyer & Peter Wagner, *Too Big to Ignore: How Counting People in Prisons Distorted Census 2000*, Prison Policy Initiative (April 2004) [hereinafter Heyer & Wagner], https://www.prisonersofthecensus.org/toobig/datasearch.php?field=GEO_NAME&operator=LIKE&q=lee&Submit

=Search&field1=Inc_Pop_Black&operator1=&q1=&sortby=&sortorder=

[https://perma.cc/7DGC-CT3Y] (containing data set showing 27.67% of the African-American population in Lee County in 2000 was incarcerated). The parties agree the census counts prisoners in its census data and the prisoners should be excluded from determining the jury-eligible population. Removing incarcerated persons from the calculation, using the State's and majority's assumed statistics regarding the number of eligible jurors, shows the number of jury-eligible African-Americans in the county was actually only 367, or 1.4%. At least one of the jurors identified as African-American. In my opinion, when the jury-eligible population is adjusted for the incarcerated persons at Fort Madison, the jury pool here was "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364, 99 S. Ct. at 668 (majority opinion). There is no reason for remand.

Second, I dissent from the majority's conclusion that run-of-the-mill jury management practices can support a systematic exclusion claim. That conclusion is in tension with *Berghuis*. A number of other jurisdictions have also concluded that run-of-the-mill jury management practices cannot support a showing of systematic exclusion. *See State v. Sanderson*, 898 P.2d 483, 488 (Ariz. Ct. App. 1995) ("Granting excuses based on the application of neutral criteria to prospective jurors' individual situations does not constitute systematic exclusion."); *Douglas v. State*, No. 2006-SC-000882-MR, 2007 WL 4462309, at *7 (Ky. Dec. 20, 2007) (finding defendant's showing that 48% of potential jurors did not respond to their summonses did not prove that the pool was not a fair cross section of the community); *People v. Wallace*, No. 237115, 2003 WL 1439812, at *7–8 (Mich. Ct. App. Mar. 20, 2003) (per curiam) (finding exemptions from jury summons based on age, citizenship, medical conditions, and inability

to speak English did not violate the fair-cross-section requirement because "a defendant is not constitutionally entitled to a petit jury that precisely mirrors the makeup of the community"); *State v. Murphy*, No. A04-926, 2005 WL 1216635, at *2 (Minn. Ct. App. May 24, 2005) (finding that excusing eligible jurors from service because they lacked transportation did not result in a Sixth Amendment violation despite the fact the exclusion decreased the number of Native Americans in the jury pool); *State v. Casillas*, 205 P.3d 830, 837 (N.M. 2009) (finding no systematic exclusion resulting from "the court clerk's practice of excusing jurors and the fact that Spanish-language jury summonses [were] not provided"); *State v. Tremblay*, No. P1 97-1816AB, 2003 WL 23018762, at *9 (R.I. Mar. 19, 2003) (finding no Sixth Amendment violation when jurors were excused because of financial hardship and medical reasons). I would follow these authorities rather than creating a new rule.

II.

Although I dissent from the majority's resolution of the constitutional claim, I do not dissent from the conclusion that the administration of justice is enhanced by greater civic participation from all members of our Iowa community. On this, everyone agrees. The other branches of the government have already enacted legislation to that effect. *See* Iowa Code § 607A.1 (2017) ("It is the policy of this state that all persons be selected at random from a fair cross section of the population of the area served by the court, and that a person shall have both the opportunity in accordance with the provisions of law to be considered for jury service in this state and the obligation to serve as a juror when selected."). In my experience, our state court administration, district court judges, district court clerks, and jury managers have acted in good faith to implement the statutory command for full civic participation in jury service. Justice

Wiggins recently chaired a commission tasked with identifying ways to increase minority representation in jury pools. Such efforts can and should continue. Ultimately, however, there is a legal distinction between constitutional command and best practices; the constitution does not require we micromanage the significant advances already made in jury representation and those yet to come.

For these reasons, and for the reasons stated in my separate opinion in *State v. Veal*, ___ N.W.2d ___, ____ (Iowa 2019), I respectfully concur in part and dissent in part.

Waterman and Christensen, JJ., join this concurrence in part and dissent in part.