# IN THE COURT OF APPEALS OF IOWA

No. 22-1123
Filed December 20, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**RALPHEAL RASHEE WILLIAMS,**
    Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David P.

Odekirk, Judge.

        The defendant appeals his conviction and sentence for first-degree robbery.

**REVERSED AND REMANDED FOR NEW TRIAL.**

        Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney

General, for appellee.

        Heard by Tabor, P.J., and Badding and Chicchelly, JJ.

**TABOR, Presiding Judge.**

Ralpheal Williams appeals his conviction for robbery in the first degree. He raises two claims of insufficient evidence. First, Ralpheal[1] argues the State did not satisfy the element of specific intent to commit a theft—requiring dismissal of the charge. Second, he contends the State failed to prove he knew that the person he was aiding and abetting possessed a dangerous weapon—one of two theories for elevating the offense to first degree. From there, he urges that the general-verdicts statute is unconstitutional, so a new trial is required. Ralpheal also alleges instructional error and advances a related claim that the district court abused its discretion in denying his motion for new trial based on the prosecutor's inaccurate statements of law in closing argument. Finally, he challenges his mandatory minimum sentence.

Viewing the evidence in the light most favorable to the State, we find substantial evidence of specific intent and uphold the verdict. Also finding substantial evidence that Ralpheal knew that his brother, Robert Williams, had a gun, we need not address the constitutionality of the statute. But because the challenged jury instruction was misleading and likely prejudicial, we reverse and remand for a new trial. With that result, we need not reach the motion-for-new-trial or sentencing issues.

## I. Facts and Prior Proceedings

Robert and his girlfriend, Ana Berinobis, were driving home to Waterloo from St. Louis in August 2020 when Tonkeya Jackson started texting Berinobis.

---

[1] Because this case involves several Williams siblings, we will use their first names.

Berinobis recalled that Robert answered the texts. In the texts, Jackson asked Robert to commit robberies. In exchange, Jackson promised him $7000. One target was a "meth head" who lived on Dearborn Avenue. Jackson texted that the target owed her money. She described him as a "dough boy," meaning someone in the drug trade who holds large amounts of cash. In response, Robert sent Jackson a photo of himself with two handguns, proclaiming: "Official." He also sent a picture of a rifle and asked "[w]hich one should I bring." Jackson advised "[b]oth" because one of the targets had a "strap but only for show."[2] Jackson also sent a map with a pin over a house located on Dearborn Ave, but not at the address in the earlier text. The image was admitted as a trial exhibit:



---

[2] Detective Nicholas Sadd testified that the text references to "strap" likely meant "that the target had access to or kept a gun on him."

About twenty minutes later, Jackson texted information about cars normally parked in the target's garage and that across the street from the Dearborn address lived "a[n] old racist named Hall." It turns out that Robert Hall lived in a house on Adrian Street near the pinned location on Dearborn Avenue.

After arriving in town, Berinobis and Robert met up with Jackson to discuss the robberies. Jackson showed them a picture of the target. Berinobis understood that Robert would be armed with his gun—black with a silver stripe—which he had "on him all day." Ralpheal was not on hand for these early discussions. But he later joined the group. The brothers ended up at the home of their sister, Tamra. There, they prepared for the robbery—donning dark clothing, latex gloves, and surgical masks. Berinobis remembered that the brothers "were hyping each other up" and "getting excited" saying, "Let's do this shit."

Around 11:30 p.m., Berinobis and Tamra dropped Robert and Ralpheal off near Dearborn Avenue. A few minutes later, Robert had a text exchange with Berinobis. Robert wrote: "I'm bout to run up across the street." Berinobis replied: "Be smart n what if that's not them babe. It's not gonna be enough to where we need to leave tonight right now." Robert responded, "Fuck it they the neighbors wit a bike n garage tweeker." She warned: "Watch surround." He then told her to stop texting him. While waiting in the car, Berinobis and Tamra heard gunshots and drove back to Tamra's house. Eventually Robert turned up there. A few hours later Jackson drove Robert and Berinobis out of Waterloo to a motel in Traer. By then, Robert no longer had his gun.[3]

---

[3] Berinobis testified that she saw Robert's gun earlier that night but did not see Ralpheal in possession of a gun at any time.

While the Williams brothers had been gearing up for the planned robbery, Robert Hall had been repairing a motorcycle in his garage. Hall's house was on Adrian Street, but his garage faced Dearborn Avenue. Around 11:15 p.m., he was joined by Richard Anderson, Roger Hinz, and Vince Hemenway. The four friends were spread across the garage, talking about the motorcycle, which belonged to Anderson.

Hall, Anderson, and Hinz gave similar accounts of what happened around 11:30 p.m. Two men approached the garage from across Dearborn Ave. They were wearing dark clothes, hats, blue surgical masks, and latex gloves. The witnesses described the gloves as either being "taped up" or the men wearing white sleeves. Robert, who was closer to the garage, "asked to use a lighter." Hemenway produced a lighter but objected when Robert "snatched it out of his hand" and started to walk away. Hemenway complained: "I said you could use it, not take it." Anderson recalled the second man, Ralpheal, commenting, "they don't want us here" and "he doesn't want you to have his lighter" followed by "come on, let's go." But Robert and Ralpheal did not leave. Instead, Ralpheal asked about the motorcycle, musing that "he always wanted a Harley." Ralpheal then directed the men in the garage to move to one side.[4] Hemenway protested. Robert pulled out a gun and shot Hemenway. Robert and Ralpheal then fled. An ambulance responded to the shooting, but Hemenway died from his wounds.

---

[4] Hall testified the statement was "You guys all need to move in the garage." Anderson heard, "I need you to come over here with the rest of them" meaning for him to join the others to one side of the motorcycle.

While on patrol in the neighborhood, Waterloo police officer Keaton Northup heard reports of the shooting. He saw Ralpheal walking nearby and stopped him. The time was 11:42 p.m. Ralpheal was "out of breath" and denied taking part in the shooting, concocting an elaborate story to explain being on foot. Patting him down, officers found a black durag, a mask,[5] and two lighters in his pockets.[6] Officers also seized Ralpheal's shoes. Impressions near the scene resembled his shoe treads. Detective Sadd confronted Ralpheal with that information, and Ralpheal claimed that he might have been in that area "looking for bullets."

In a nearby woods, officers found a cell phone, a surgical mask, and a handgun. DNA testing of the mask matched Robert's profile.[7] The handgun, a Smith & Wesson, was black with a silver stripe. A state criminalist testified that the shell casings found around the garage were fired from the Smith & Wesson. Officers also found a piece of a blue latex glove, two intact gloves with white wrist extensions, and a black t-shirt. Ralpheal's DNA was on the t-shirt. DNA testing of the gun and gloves was inconclusive.

The State charged Ralpheal with first-degree robbery, in violation of Iowa Code section 711.1(1)(A) (2020), a class "B" felony. The jury found him guilty in a general verdict, and the court sentenced him to twenty-five years in prison with a mandatory minimum term of seventeen-and-one-half years of incarceration. Ralpheal appeals.

---

[5] Ralpheal called it a "COVID mask."

[6] The lighters were not preserved as evidence. Hemenway's lighter was not found.

[7] To be precise, "[t]he probability of finding this profile in a population of unrelated individuals, chosen at random, would be less than 1 in 320 octillion."

## II. Analysis

### A. Intent to Commit Theft

Ralpheal first contends the State offered insufficient evidence of his intent. We review that claim for the correction of legal error. *See State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdict was supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational trier of fact that Ralpheal is guilty beyond a reasonable doubt. *See id.* We consider all reasonable inferences that may fairly be drawn from the evidence. *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017).

To convict Ralpheal of first-degree robbery, the jury had to find:

> 1. . . . [Ralpheal] had the specific intent[8] to commit a theft[9] or [he] aided and abetted[10] another person or persons who [he] knew had the specific intent to commit a theft.

---

[8] Specific intent was defined as

> not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
>
> Because determining a person's specific intent requires you to decide what he or she was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the person's specific intent. You may, but are not required to, conclude a person intends the natural results of his act.

[9] Theft was defined as "taking possession of property that belongs to another with the intent to permanently deprive the other person of the property." The jury was further instructed, "It is immaterial to the offense of Robbery whether property was or was not actually stolen" and, "It is immaterial to the offense of Robbery whether a specific person was the target of the theft." We address that last instruction after analyzing the sufficiency of the evidence.

[10] Aid and abet means

> to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the Defendant's earlier participation. Mere nearness to, or

   2. To carry out his intention or the intention of a person he aided and abetted or to assist him or a person he aided and abetted in escaping from the scene with or without stolen property, either [Ralpheal] or a person he aided and abetted:
   A. committed an assault on Vincent Hemenway,
   or
   B. threatened Vincent Hemenway with, or purposely put Vincent Hemenway in fear of immediate serious injury. [And,]
   3. [Ralpheal] or a person he aided and abetted:
   A. inflicted a serious injury,
   or
   B. had knowledge the person he aided and abetted possessed a dangerous weapon.

Ralpheal contends there is insufficient evidence that he had the specific intent to take property from Hemenway or that he knew Robert had the specific intent to take Hemenway's property. In defending the verdict, the State broadens the scope of the intended theft beyond Hemenway, asserting: "[T]he fact that the two brothers went to the garage, when logic would have dictated avoiding unnecessary interactions with strangers, has no good explanation unless they stood to gain something from the encounter."

Viewing the evidence in the light most favorable to the State, we find substantial evidence to support the jury's finding that Ralpheal had the specific intent to commit theft or knew Robert had that intent when they approached the garage. Ralpheal points out that Hemenway's lighter was never recovered and that Anderson recalled Ralpheal telling Robert they should return the lighter and leave. But he focuses too much on the interaction between Robert and Hemenway over the lighter. The instructions did not specify what property the Williams

---

presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

brothers intended to take. Rather, the State had to show Ralpheal's intent—or knowledge of Robert's intent—to "commit *a* theft." The evidence suggests that Robert asked about the lighter and pulled his gun—which matched the one Berinobis described.

Beyond the lighter, Ralpheal revealed an intent to commit theft when he tried to shepherd the men away from the motorcycle, saying he always wanted a Harley. Those words sound innocuous alone. But context is important. Ralpheal accompanied his brother to commit a robbery at a nearby house. For unknown reasons, that robbery did not happen. Perhaps because Jackson's text pinned the wrong house. A text from Robert to Berinobis, just before shots rang out, documented that Robert noticed the men and motorcycle in the garage facing Dearborn Avenue. Jackson had earlier told Robert that "a[n] old racist name[d] Hall" lived across the street from the robbery target. Robert and Ralpheal kept on the masks and gloves they wore for the original robbery and approached Hall's occupied garage as the hour neared midnight. From that conduct, the jury could reasonably infer that they intended to commit a theft. *See State v. Stendrup*, 983 N.W.2d 231, 242 (Iowa 2022) (citing *State v. Worthen*, 82 N.W. 910, 911 (Iowa 1900), and noting a defendant's arrival at a victim's home in the middle of the night refutes "innocent purposes"). Thus, substantial evidence supports Ralpheal's robbery conviction.

**B. Knowledge of a Dangerous Weapon**

Ralpheal next contends the State did not offer sufficient evidence to show that he knew Robert possessed a dangerous weapon.[11]  Possessing a dangerous weapon was one of two alternatives for enhancing the robbery to first degree.  *See* Iowa Code § 711.2.  The other alternative, that Robert inflicted a serious injury, is uncontested.  But because the jury returned a general verdict, Ralpheal contends that insufficient evidence of one alternative requires a new trial.  Ralpheal believes that we can grant that remedy because the general verdict statute at Iowa Code section 814.28 is unconstitutional.

But we need not reach his constitutional claims because we find substantial evidence that Ralpheal knew his brother was armed.  *See State v. West Vangen*, 975 N.W.2d 344, 347 (Iowa 2022).  True, Ralpheal was not present when Robert formed the initial plan with Jackson.  But Ralpheal did agree to help his brother with a robbery or series of robberies.  Bernobis testified that Robert had a gun on him "all day" and planned to arm himself for the robberies.  But she did not testify that Ralphael knew about Robert's weapon.  Ralpheal argues that without direct evidence, the State failed to prove the dangerous-weapon enhancement.  He compares his case to *State v. Henderson*, where the getaway driver testified that "the plan was not to use a gun" and the State offered "no contrary evidence as to how the robbery plan developed."  908 N.W.2d 868, 876, 878 (Iowa 2018) (reversing first-degree robbery conviction).

---

[11] The court instructed the jury that a gun is a dangerous weapon.

The State counters the jury could have reasonably inferred that when the brothers discussed the robbery plans and dressed to commit the crime, Ralpheal would have been aware of his brother's gun. The State insists "it is almost inconceivable" that Ralpheal would have agreed to commit a robbery at the home of a "meth head" without knowing his brother was armed. The State contends this case is more like *State v. Lilly*, 930 N.W.2d 293 (Iowa 2019), than *Henderson*. Our supreme court upheld Lilly's conviction for first-degree robbery, finding that as the "drop-off driver" it was rational to conclude that he would have seen the principal's gun in the car. *Id.* at 309.

We agree with the State. The jury could fairly infer from the evidence that Ralpheal knew that Robert possessed a dangerous weapon. Unlike *Henderson*, this record contains no suggestion that Ralpheal believed the plan was to commit the robberies without a gun. Rather, Ralpheal knew that the targets of the robberies engaged in the drug trade where guns were prevalent. He and his brother spent time together changing clothes and "hyping each other up." They rode together in a car to the area of the intended robbery. Like *Lilly*, these facts allow a reasonable jury to infer that Ralpheal had seen the gun at their sister's house or in the SUV. Finding the State satisfied both enhancing elements for first-degree robbery, we affirm his conviction without addressing the constitutionality of the general-verdict statute.

## C. Jury Instruction No. 28

At the State's request, the district court instructed the jury: "It is immaterial to the offense of Robbery whether a specific person was the target of the theft."

That instruction, No. 28, was not a stock instruction.[12]  At trial, defense counsel objected, expressing concern that the instruction would allow the State to argue that the individual on Dearborn Avenue was the original target, but the people in the garage on Adrian ended up as the victims.  Counsel worried: "It would create confusion of [there] somehow being a conglomeration of offenses here."  The prosecutor originally described No. 28 as addressing "transferred intent" for the robbery.  But he later disclaimed that description.  The prosecutor argued that the instruction was intended to "remedy" the marshaling instruction, which was prone to manipulation.[13]  The district court found that Instruction No. 28 was a correct statement of law and "merely clarifies the other instructions."

On appeal, Ralpheal reprises his argument that the instruction suggested a "transferred intent" theory, which was improper under these facts.[14]  He argues that the instruction "muddied the waters as to what was required for the State to

---

[12] Neither Jury Instruction No. 27 nor No. 28 were uniform criminal jury instructions. The State asked that they be included based on *State v. Boley*, 456 N.W.2d 674 (Iowa 1990).  Boley challenged a jury instruction reading, "It is immaterial to the offense of Robbery whether the property was actually stolen," echoing Instruction No. 27.  456 N.W.2d at 679.  The *Boley* court stated, "A conviction of robbery requires proof of the intent to commit a theft and not proof of an actual theft.  It is therefore irrelevant that the cash register was not opened and the defendant did not take any money or cigarettes from the [gas] station."  *Id.* (internal citation omitted).  But we do not see in *Boley* any basis for giving Instruction No. 28.

[13] It is unclear from the prosecutor's argument at the jury instruction conference how the marshaling instruction for robbery could be "manipulated" by the defense or how the non-uniform instruction would "remedy" that situation.

[14] "Iowa's courts have repeatedly applied the doctrine of transferred intent to impose liability where a criminal defendant acts with intent to kill or harm one person but inadvertently kills or harms an unintended person." *State v. Mong*, 988 N.W.2d 305, 313 (Iowa 2023).  That doctrine doesn't apply to the Williams brothers because their shift toward the garage occupants was not inadvertent or the result of mistake or accident.  *See, e.g.*, *id.* at 308–09, 312–14 (finding intent transferred when Mong threatened to kill a romantic rival and shot his gun intending to hit the rival but hit a different person).

prove specific intent of the robbery and misdirected the jury as to that element." Ralpheal reasons that "[b]y allowing the jury to 'transfer' the intent to commit a theft from the Dearborn house to the garage's occupants, the instruction lessened the State's burden of proof." He also contends the instructional error violated his constitutional right to present a defense and due process.

Generally, "[w]e review challenges to jury instructions for correction of errors at law." *State v. Ross*, 986 N.W.2d 581, 584 (Iowa 2023). But, "when a jury instruction implicates a constitutional right, our review is de novo." *State v. Green*, 896 N.W.2d 770, 775 (Iowa 2017). Erroneous jury instructions warrant "reversal when prejudice results." *State v. Coleman*, 907 N.W.2d 124, 138 (Iowa 2018). "Prejudice results when jury instructions mislead the jury or materially misstate the law." *State v. Benson*, 919 N.W.2d 237, 241–42 (Iowa 2018). We read the instructions "as a whole to determine their accuracy." *State v. Kraai*, 969 N.W.2d 487, 490 (Iowa 2022) (citation omitted).

Ralpheal acknowledges that Instruction No. 28 is a correct statement of the law—in the abstract. But he argues it was misleading here because it allowed the jurors to "conflate the specific intent of what occurred earlier in the day with what actually occurred in the garage that night." Ralpheal fears that the jurors could have believed it was enough for him to have formed the specific intent, or knew of Robert's specific intent, to commit the planned thefts, and then rejected his defense that he did not participate in or encourage Robert's impromptu interactions with the occupants of the garage.

In its response, the State asserts that Instruction No. 28 "supplemented the marshaling instruction" but does not make clear what aspect of the marshaling

instruction needed supplementing. The State tries to dispel Ralpheal's fear that the jury could misapply Instruction No. 28 by pointing to the second element of the marshaling instruction. That element required the State to prove that the brothers assaulted Hemenway specifically to carry out their intent to commit a theft or to help them escape from the scene with or without stolen property. According to the State, the marshaling instruction made clear that the jury must find "a direct causal connection" between the intended theft and the assault.

The need for that nexus would be more evident if the jurors read only the marshaling instruction. But then there's Instruction No. 28 to confuse the issue. Now the jurors are told it doesn't matter whether Hemenway or any specific person was the target of the theft. That instruction severed the connection required between the intent to commit theft and the assault on Hemenway. It improperly broadened the scope of the intent element. *See State v. Copenhaver*, 844 N.W.2d 442, 449 (Iowa 2014) (explaining that unit of prosecution for robbery requires the accused to have the intent to commit a theft, "coupled with" an assault, a threat to commit an assault, or a threat to commit immediately any forcible felony). The extra instruction left open the possibility of decoupling the intent to steal from the original target—the "meth head" or "doughboy" who allegedly owed money to Jackson—from the assault on Hemenway that helped the brothers get away from the garage with or without stolen property.

And the prosecutor doubled down on this obfuscation in closing by describing the events like this:

> You heard a lot of evidence about how this plan was to occur at [an address on] Dearborn just north of [the garage on] Adrian . . . Ana [Berinobos] had testified to a number of different locations that

had been planned. The text messages would support that there were a number of different addresses, not only Dearborn but California, California and Lafayette, a number of different addresses. That because they don't go to that residence and because they do not assault those individuals that it can't be robbery. Instruction 28 tells us something different, says it's immaterial to the offense of robbery whether a specific person was the target of the theft. It is immaterial for this offense for them to have carried it out the way that Tonkeya [Jackson] and Robert and Ana had planned it out.

Later, the prosecutor continued to insist that the State had proved the elements of robbery even if the Williams brothers "simply went" to the wrong address:

[T]hey were looking for the house, the house just north. . . . Again, talking about carrying. These people have drugs.
. . . [T]hey started talking about an old racist named Hall, the one across the street. The one we'd submit to you is clearly Robert Hall. So at this point they're still referencing [an address on] Dearborn. They're talking about across the street. And I would submit to you it changes. It changes once they get on scene. It changes once this didn't play out the way they anticipated. Whether it hadn't played out the way anticipated or whether they just simply went to the wrong house. It doesn't matter. In those three elements we're required to prove[,] it doesn't matter.

In response, defense counsel redirected the jury's attention to the garage occupants saying,

[T]he crime we're talking about, the reason that we're here today is the events that happened at [the garage]. It was not the plan to go to [an address on] Dearborn. It's not about that. That was, as Investigator Sadd said, that was aborted. Clearly it didn't happen. So when the State talks about oh, he was hyping him up in the car ride over that relates to [an address on] Dearborn. The question you have to ask yourself is at [the garage on] Adrian did Ralpheal do anything to actively participate in what Robert did or somehow knowingly advise and encourage Robert to do that?

But in rebuttal the prosecution again invoked Instruction No. 28: "[Defense] counsel stood up here and told you that Ralpheal's actions were towards [an address on] Dearborn and not [the garage on] Adrian. The response is no. The response is it doesn't matter." Finally, the prosecutor told the jurors:

> Do not overthink this. There was one reason and one reason only why Ralpheal Williams was there and that was to help his brother, that was to assist his brother, that was to continue to encourage his brother so they could steal. So they could use Robert's firearm, strong arm people. It didn't matter who it was. And the instructions tell you it doesn't matter who it was.

Despite disavowing reliance on the transferred-intent doctrine, the prosecutor repeated that the identity of the victim didn't matter because Ralpheal was there to help Robert steal and "strong arm people." At no point did the prosecutor clarify to the jury that those "people" were limited to the four occupants of the garage. Instead, the prosecutor exploited the ambiguity of the extra instruction. His closing arguments suggested that a free-flowing, general intent to commit some theft that evening was enough. Hearing the prosecutor's response to the defense argument, the jurors could have been fooled into thinking that the evidence of Ralpheal's specific intent to commit the planned theft on Dearborn Avenue could meet the first element of the robbery charge.

Granted, "jury instructions need not be perfect." *State v. Ross*, 986 N.W.2d 581, 586 (Iowa 2023). But we will find an instruction misleading if it is "very possible" that the jury could have interpreted it incorrectly. *Id.* (citation omitted). So while the State did not overtly claim transferred intent applied here (and didn't ask for that jury instruction) we read Instruction No. 28 and the prosecutor's closing argument as encouraging the jury to find the brothers' original intent transferred to the events at the garage. Because the instruction permitted that reading, undermined the causation requirement in the marshalling instruction, and improperly broadened the scope of the intent element, the court erred in giving it.

Having determined the district court erred by giving an instruction that inappropriately invited a finding of transferred intent, we must address whether that error requires a new trial. Ralpheal argues the erroneous instruction caused him prejudice by impairing his defense that he did not have the requisite intent toward the garage occupants. But even if we do not see the error as implicating his constitutional rights,[15] we still find prejudice.

When the court erroneously gives a jury instruction, "we presume prejudice and reverse unless the record affirmatively establishes there was no prejudice." *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010). "When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985). "The presumption of prejudice is overcome when the jury received 'strong evidence' of a defendant's guilt." *Kraai*, 969 N.W.2d at 498 (citation omitted).

Although we found sufficient evidence to sustain Ralpheal's conviction over his sufficiency-of-the-evidence claims, because the challenged instruction improperly tainted the jury's consideration of his intent to commit a theft at the garage, we cannot conclude that the record "affirmatively establish[es] the absence of prejudice." *Ross*, 986 N.W.2d at 590 (alteration in original) (citation omitted). The State did not present "strong evidence" of Ralpheal's intent toward

---

[15] We view the error here as nonconstitutional. Although the challenged instruction may have reduced the efficacy of Williams's defense, he was still able to argue his interpretation of the intent element to the jury. An alleged error "must go to the heart of the case" in being considered of constitutional magnitude. *See State v. Traywick*, 468 N.W.2d 452, 455 (Iowa 1991).

the garage occupants. Ralpheal's knowledge of Robert's intent to steal Hemenway's lighter or Ralpheal's own intent to steal the motorcycle depend on the stacking of inferences. And the proof of Ralpheal's knowledge or intent is enough for a conviction only when viewed in the light most favorable to the verdict.

In contrast, the State offered the jurors copious evidence about the brothers' intent toward the targets on Dearborn Avenue and other locations. We agree with Ralpheal that Instruction No. 28 risked lowering the State's burden of proof by letting the jury convict based on that evidence rather than the evidence of the brothers' intent toward the garage occupants. Fueled by misleading arguments from the prosecutor, we think the instruction would "very possibly" have misled the jury and injuriously affected Ralpheal's right to defend against the robbery charge. It undermined his efforts to argue the lack of specific intent to commit a theft at the garage after the Dearborn robbery plan was abandoned. Because the record does not affirmatively establish that there was no prejudice, we reverse the conviction and remand for new trial. *See Coleman*, 907 N.W.2d at 138.

Because we reach this conclusion, we need not address Ralpheal's related claim that the prosecutor's misstatements of the law warranted a new trial or his sentencing claim.

**REVERSED AND REMANDED FOR NEW TRIAL.**