# IN THE COURT OF APPEALS OF IOWA

No. 23-0876
Filed July 24, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**TRAPP LEROY TROTTER JR.,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Worth County, Rustin Davenport,

Judge.

    A criminal defendant appeals the denial of his challenge to his jury's

composition.  **AFFIRMED.**

    Martha J. Lucey, State Appellate Defender, and Bradley M. Bender,

Assistant Appellate Defender, for appellant.

    Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.

    Considered by Greer, P.J., Chicchelly, J., and Blane, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BLANE, Senior Judge.**

Trapp Trotter appeals the district court ruling rejecting his fair-cross-section challenge to the jury that convicted him of attempted murder and criminal trespass. He contends the district court erred in finding he failed to satisfy his burden to prove there was systematic exclusion of a distinctive group from the jury pool. On our review, we affirm.

## I. Background facts and proceedings

In 2018, Trotter was charged with attempted murder, first-degree burglary, and fourth-degree criminal mischief. The court granted a change of venue from Worth County to Bremer County. At trial, Trotter, an African American, challenged the composition of the jury, asserting jury pools over the previous year underrepresented African American potential jurors in Bremer County. The court denied that challenge, and the all-white jury found Trotter guilty of attempted murder and the lesser included criminal trespass.[1]

On direct appeal, our court affirmed his convictions conditionally and remanded with directions for reconsideration of Trotter's jury-composition challenge. *State v. Trotter*, No. 19-1019, 2021 WL 594559, at *2 (Iowa Ct. App. Feb. 3, 2021). Our court found the district court did not have the benefit of "our supreme court's clarification of the *Duren*[2]/*Plain*[3] test when it decided this case in April 2019." *Id.* (noting the supreme court handed down *State v. Lilly* (*Lilly I*), 930 N.W.2d 293 (Iowa 2019), in May 2019). We remanded for Trotter to "develop his

---

[1] Trial started on April 16, 2019, and the jury returned its verdict on April 19, 2019.
[2] *Duren v. Missouri*, 439 U.S. 357 (1979).
[3] *State v. Plain*, 898 N.W.2d 801, 821–22 (Iowa 2017).

arguments that his constitutional right to a jury drawn from a fair cross-section of the community was violated." *Id.* We held, "If the district court finds a violation, it shall grant Trotter a new trial." *Id.*

On remand, the district court heard additional evidence on Trotter's claim. This included testimony from Iowa Judicial Branch director of information technologies, Mark Headlee; Bremer County jury manager, Elizabeth Hamm; director of the Center for Jury Studies at the National Center for State Courts, Paula Hannaford-Agor[4]; and private statistical consultant, Grace Zalenski.[5] The district court readily found that African American, Hispanic and Latino American, Asian American, and mixed-race persons are all distinctive groups in the community that satisfy the first prong of the *Duren/Plain* test. While noting that in counties with "large percentages of white populations . . . it would be unlikely, or even impossible, to satisfy" the statistical criteria set out in *Lilly I* to determine underrepresentation, the court "accept[ed] the State's view that Trotter . . . satisfied the second prong" of the *Duren/Plain* test.

Focusing on the third prong, which requires proof of systematic exclusion of a distinctive group, in a thorough decision the district court found Trotter did not meet his burden:

> Neither Hannaford-Agor nor Zalenski offered any opinion that the State of Iowa and Bremer County's method of selecting jurors led to any underrepresentation of any population group. Hannaford-Agor concluded that the steps used by the court system, with each successive step used to identify, contact, and acquire the presence of jurors for a trial, resulted in jury pools and jury panels consistent with the composition of the jury-eligible population in Bremer County.

---

[4] A court-appointed expert witness.
[5] Trotter's expert witness.

> Hamm's testimony does suggest a systematic exclusion of non-English-speaking or noncitizens who may later be qualified to serve on the jury. However, there is no evidence that any such exclusions resulted in any significant numbers of underrepresentation for later jury pools or jury panels. Trotter has not shown, if such practice existed, that it would result in any "statistically significant disparity" in later years. Trotter did not present evidence that there is a causal link between these practices and underrepresentations of Hispanics/Latin Americans.

(Citation omitted). To the extent that Trotter used specific incidents to support his claim of systematic exclusion, the court found "these incidents do not show exclusions of members of population groups." Trotter appeals.

## II. Standard of review

Our review of this constitutional challenge is de novo.[6] *See State v. Williams*, 972 N.W.2d 720, 723–24 (Iowa 2022).

## III. Analysis

### A. Error Preservation

The State contends Trotter failed to preserve error on his arguments of underrepresentation of any distinctive group other than African Americans by failing to raise them before the trial court before remand, even though the district court ruled on them following remand. We choose to address those arguments on appeal.

### B. Jury Cross-Section Challenge

Trotter contends the district court erroneously denied his fair-cross-section challenge under the Sixth Amendment of the United States Constitution and the Iowa Constitution article I, section 10. Both the Sixth Amendment and article I,

---

[6] Trotter and the State agree the court has jurisdiction to hear the appeal from a final order of the district court. *See* Iowa R. App. P. 6.103(1).

section 10 guarantee the right to trial by an impartial jury. U.S. Const. amend VI; Iowa Const. art. I, § 10. To be impartial, a jury must be "drawn from a fair cross-section of the community." *Williams*, 972 N.W.2d at 723 (citation omitted).

To prove a prima facie violation of the fair-cross-section requirement, an accused must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) representation of this group in the jury venire is not fair and reasonable compared to the number of such persons in the community; and (3) this underrepresentation arises from systematic exclusion of the group in the jury-selection process. *Plain*, 898 N.W.2d at 821–22 (quoting *Duren*, 439 U.S. at 364).

The State concedes prongs one and two. The only issue on appeal is prong three—whether the underrepresentation of the distinctive groups is due to systematic exclusion in the jury-selection process. This requires Trotter to "establish the exclusion is 'inherent in the particular jury-selection process utilized'" in Bremer County and that such process "caused the systematic exclusion of the distinctive group[s] in the jury selection process." *Williams*, 972 N.W.2d at 724 (quoting *Plain*, 898 N.W.2d at 824). In *State v. Lilly* (*Lilly II*), the supreme court found the defendant "failed to deliver on his burden under the third prong" because he was unable to "pinpoint[] the procedural step in which African-Americans were excluded and offer[] a plausible explanation for how the summoning and qualification process brought it about." 969 N.W.2d 794, 799–800 (Iowa 2022).[7]

---

[7] Trotter urged the supreme court to retain this case and reconsider how it applies the third prong of the *Duren*/*Plain* test. Under the court's jurisprudence, the Sixth Amendment is not offended by "'run-of-the-mill' jury management practices." *Plain*, 969 N.W.2d at 297. But under the Iowa Constitution, article I, section 10,

On remand, the court received databases of jury and demographic records from Trotter and the State and listened to testimony from Headlee, Hamm, Hannaford-Agor, and Zalenski. Headlee explained the process implemented to compile the jury master list for each Iowa county and the jury selection software program used by the Iowa Judicial Branch. In 2016, the Branch removed the option for potential jurors to opt out of reporting their race on the online questionnaire. The Juror for Windows software was used until December 2018, when the Branch switched to Clearview software, which had a mandatory answer field for race in the questionnaire. He also explained that when different jury lists are merged, it may leave duplicate entries for the same person.[8]

Hamm explained that jury managers do not have access to the master jury lists; instead, managers enter how many jurors they need into Clearview, and that program generates the list. In Bremer County, they typically draw seventy-five to eighty people a month to serve on juries. Postcards are then sent out, requesting the potential jurors go to an online juror management program to fill out paperwork and the questionnaire. When postcards come back undeliverable, Hamm looks at the Iowa Department of Transportation and Iowa Courts Online docketing

---

such "run-of-the-mill jury management practices *can* support a systemic exclusion claim." *Lilly II*, 969 N.W.2d at 799 (citing *Lilly I*, 930 N.W.2d at 308). Trotter argues that the application of *Duren*/*Plain* in *Lilly II* undermines the functioning of the jury. He asks the supreme court to reconsider *Lilly II* and hold under Article I, section 10 of the Iowa Constitution that courts should presume that jury management procedures cause underrepresentation. But the supreme court transferred his appeal to us, and we are not at liberty to overturn its precedents. *See State v. Dewbre*, 987 N.W.2d 861, 866 (Iowa Ct. App. 2022).

[8] The master list is developed from the Iowa Department of Transportation motor vehicle licenses and non-license identification cards and the voter registration list. This may produce duplications.

databases to see if there is an updated address. If there is no alternative address, the potential juror is labeled "undeliverable." Hamm was unaware what happened with that entry after being labeled "undeliverable." When Hamm finds duplicates— typically one or two each month—she deletes the extra record so each eligible individual has only one account in the jury system. She also testified that once the juror has completed their service, she processes the payment for their time and mileage and removes them from the system for two years.[9]

When potential jurors do not respond to the initial postcard, the system generates a "non-responded" letter which is sent to them. If they still do not respond, the name stays in the pool until they respond or are able to serve. If the potential juror responds to the mailed correspondence but does not appear at the courthouse when they are called, they remain on the service list through the following month. If they fail to appear a second time, the court can keep them on the list for another month or initiate contempt. In counties where the percentage of jury trials is low, Hamm found that contempt actions were rare. She stated most people respond when they get a failure-to-appear notice. Jury managers also handle some dismissals of potential jurors before trial, for example if the person is a noncitizen or non-English-speaking, medical reasons, or if the person now lives in a different county or state. Some are excused and some have their service postponed for another time. Excuses like financial burdens or childcare obligations are handled by the judge during jury selection. Hamm also testified that when potential jurors are disqualified for citizenship or language reasons, "[t]he system

---

[9] *See* Iowa Code § 607A.29 (2016).

permanently disqualifies them." At that time, she believed it was mandatory for potential jurors to fill in their race on the online questionnaire or she would have clarified it with them when they checked-in for the trial.

Hannaford-Agor, the court appointed expert, both testified and submitted a written report of her analysis. She testified that research on jury management procedures in the 1970s and 1980s showed reliance on source lists such as voting rolls and driver licenses led to underrepresentation of people of color, younger people, and people of lower socioeconomic means. This prompted a move toward using multiple lists, even if that resulted in duplicate entries. This led to the substantial overcounting, or "overinclusive" lists with "ghosts" and "shadows." "Shadows" is a "tongue-in-cheek" term for duplicates. And "ghosts" are entries with stale addresses for people who no longer live in the jurisdiction. Both "undermin[e] the effectiveness of the lists" by increasing the chance of "a fundamental violation of random selection," meaning individuals should appear only once, or they are twice as likely to be selected as someone who appears only once. Depending on the state, white potential jurors can have more duplicates, increasing the chance of being called to serve on a jury disproportionately often. Hannaford-Agor now recommends focusing on the quality of the master jury list, not including more lists or types of lists. She also recommends that the master jury list should reflect at least 85% of the adult population of the jurisdiction and no more than 110% to avoid over-inclusiveness distortions.

Hannaford-Agor also testified about the use of suppression lists— suppressing names of people who have died or have done their required jury service is common. But, she explained, "where I have seen courts get into trouble

with suppression files is basically suppressing factors that can change" such as age, with seventeen-year-olds becoming eligible for jury service at eighteen; people with felony convictions having their civil rights restored; and non-English speakers learning English. She testified that suppression on the latter two bases is more likely to exclude Hispanic or Latino American and Asian American potential jurors than African American or Native American potential jurors. She also testified that permanent exclusion of noncitizens and non-English speakers would qualify as a systematic exclusion of that group.

On her read of the data, the last time there was an African American potential juror in Bremer County was February 2016, but that included the period when reporting race was optional. But the population of jury-eligible African Americans in the county was 1.4%. In her report, Hannaford-Agor gave the opinion that the most accurate method of documenting the race of jurors is to ask them to self-report, but she used a "geocoding" method to infer the race of prospective jurors for whom that data was missing. Because Bremer County is "overwhelmingly white," the sample size was too small to detect underrepresentation of African American potential jurors in the jury pools. She concluded:

> The geographic and demographic composition of prospective jurors through each successive step in the summoning and qualification process is consistent with the composition of the jury-eligible population in Bremer County. Factors that tend to correlate with underrepresentation of people of color in the jury pool, such as nonresponse, undeliverable, disqualification, and excusal rates, were proportionately consistent with geographic representation across [zip code tabulation areas], including 50677. This consistency across the successive stages of the jury selection process suggests that these factors are not causally related to

representation of non-Whites in the jury pool, especially Blacks/African-Americans, even if such was statistically measurable.

Zalenski, the statistical consultant, testified that there is "weak statistical evidence that there is underrepresentation" of African American potential jurors in the jury pools in Bremer County. And her report concluded there was underrepresentation of Asian American, Hispanic and Latino American, and mixed-race potential jurors in the jury pools and overrepresentation of white potential jurors. But when asked to pinpoint "any evidence that the process that was used to form the jury panels" in Bremer County in April 2019 "systematically excluded any minority groups," Zalenski commented, "I have no knowledge or expertise in the process of jury selection. I've picked up a bit about it but . . . all I do is the statistical analysis. . . . [A]s far as the process of jury selection, I can't really comment on it."

In *Lilly II*, the supreme court placed the burden on the defendant challenging the jury pool composition to "identify 'the precise point of the juror summoning and qualification process in which members of distinctive groups were excluded from the jury pool'" and then "offer 'a plausible explanation of how the operation of the jury system resulted in their exclusion.'" 969 N.W.2d at 799 (quoting *Lilly I*, 930 N.W.2d at 307).

On remand, Trotter produced no evidence of the point in the process where African American potential jurors were excluded from the jury pool. Hamm testified that during Trotter's 2019 trial, new policies had been implemented to ensure the collection of racial data for jury pools. And Hannaford-Agor included in her statistical analysis that 1.4% of the jury-eligible population of Bremer County was

African American but estimated only 0.66% of the master jury list was African American. Still, Hannaford-Agor reported that African Americans were not underrepresented in jury pools, even when using geocoding to infer the race of prospective jurors. She also reported that nonresponse, undeliverable addresses, disqualification, and excusals were proportionately consistent across geographic areas. Her conclusion was that those factors were not causally related to the underrepresentation of non-white groups in the jury pools in Bremer County since 2016. And Trotter's expert, Zalenski, had "no knowledge" about the process of jury selection and expressed no opinions that the process used in Bremer County contributed to underrepresentation of any distinctive group there.

Trotter points to two members of his jury pool that he argues show an unfair cross-section. Both jurors had served on juries recently and were called again, even though Hamm testified jurors who have served are not called again for two years. Both jurors were white, which Trotter argues shows the prevalence of white-leaning duplicates in the jury list, thus, evidence of a systematic exclusion of non-white potential jurors. Juror J.B. had a duplicate record in the master jury list. The trial court explained how this occurs.

> Trotter argues there is proof of systematic disparity by failure to excuse jurors after trial service. Several jurors on Trotter's panel said they had served on a previous jury two weeks before Trotter's trial. Iowa Code section 607A.29 limits a person's jury service to no more than a term of service not to exceed three months in any two-year period. Here the jurors were called for different trials within their term. Once a jury panel has been compiled, any individual person might have to appear for multiple trials during that term. If these jurors were excused, no new jurors would be added to the panel for that term. Excusing these jurors could not result in the possible addition of non-White jurors, as once the panel has been selected for the term, generally no more prospective jurors are added to the

panel during the remainder of the term. There is no proof of any systematic practice that causes disproportionate representation.

Trotter contends that juror JB was drawn for Trotter's panel despite him completing jury service within two years. This was due to JB having a duplicate record. The system errs on including more people when it is unclear and avoids excluding someone who should not be excluded. It is possible by including JB on Trotter's panel, it reduced the chance that a non-White would have been selected in JB's place. Given the percentage of the White population in Bremer, the far greater likelihood is that another White person would have replaced JB. The chances of a non-White replacing JB is so small that this does not constitute proof that having JB on the panel resulted in the exclusion of a non-White juror. It would not have any "statistically significant disparity." *Lilly*, 930 N.W.2d at 307.

The State argues, and we agree, that Trotter failed to show from these limited examples that any process utilized by the court resulted in systematic exclusion of any distinctive group. Hamm testified she was aware of duplicates in the system and worked to eliminate them. Trotter also failed to present any evidence that the duplicates on the jury list were disproportionately white individuals. Hannaford-Agor testified that factor varied by state, but she had no data for the master jury list she analyzed in Trotter's case. She said the best practice was focusing on the quality of the list, including eliminating "ghosts" and "shadows," which Hamm testified she does. Overall, Trotter did not produce evidence of any step in the process that plausibly resulted in the exclusion of a distinctive group.

In an unusual twist, eleven days after the hearing on remand, the court filed a "notice to the parties" regarding Hamm and Hannaford-Agor's testimonies on permanent exclusion of noncitizens and non-English speakers. The court said:

> After inquiry, the Court was informed by court administration that such persons are not permanently disqualified. Such persons could potentially be called again to serve on the jury in two years.

Accordingly, the current policy and current practice does not have to be modified.

The information that I received through my inquiry was contrary to the testimony of Liz Hamm. The Court's review of this matter is limited to the testimony and evidence presented during the October 27, 2022, hearing. However, I believe that it is appropriate to disclose the information that I have received from other sources.

Then in its April 26, 2023 ruling, the court wrote:

Hamm was asked about what happens if a person who does not speak English or who is not a United States citizen appears on a jury pool. She explained that those persons were disqualified. She was asked whether they were permanently disqualified, and she replied that the system permanently disqualifies such persons. This would have the risk of excluding persons who were not able to communicate in English or were not United States citizens and who later obtained the necessary language skills or later became a United States citizen which would then allow them to serve as a juror. By permanently disqualifying these persons, there is potential that there could be an underrepresentation of such population groups. Over time, Hispanic/Latin Americans, as an example, could become underrepresented on jury pools.

As noted in the Court's notice to the parties filed November 7, 2022, Hamm's testimony does not accurately describe court procedures. Persons who are disqualified due to inability to speak English or because they are not citizens are not permanently disqualified and may be called as jurors again after two years.

Since evidence was not introduced at the October 27, 2022, trial to contradict Hamm's testimony, the Court relies upon Hamm's testimony that persons not speaking English or persons who are not citizens are permanently disqualified from serving on future juries.

There was no evidence presented that any of the methods used by the court system resulted in disparate results among different groups of the community. There was no evidence presented that there was any significant numbers of non-English-speaking persons or noncitizens in Bremer County who later became eligible to serve on a jury, resulting in an underrepresentation of those persons

We agree with the court that information provided to it after the record has been closed in a case is not to be considered in the ruling. *See Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 697 n.4 (Iowa 2010) (excluding from discussion evidentiary facts outside the record). But, even if we assume that Hamm and

Hannaford-Agor testified correctly and permanently disqualifying noncitizens and non-English speakers from jury pools has the effect of excluding Hispanic and Latino American or Asian American potential jurors, we have no data in the record showing any of the small number of those distinctive groups in Bremer County are noncitizens or non-English speakers. Trotter produced no evidence that members of those distinctive groups would be excluded from jury pools as a result of this policy in Bremer County.[10]

Because Trotter has failed to produce evidence to support the existence of systematic exclusion in his trial, we affirm the ruling of the district court.

**AFFIRMED.**

---

[10] In an order on Trotter's motion to clarify the ruling, the court said:

> Defendant seeks clarification of the Court's order at pages 10 and 11 discussing Elizabeth Hamm's testimony that non-English-speaking or noncitizens are excluded from jury service even though they may later be qualified to serve on a jury. The Court recognizes that Paula Hannaford-Agor did testify that permanently excluding such persons from the jury would cause underrepresentation of such persons. However, there was not sufficient evidence presented that if such practice existed, it would result in any "statistically significant disparity" in later years. *See State v. Lilly*, 930 N.W.2d 293, 307 (Iowa 2019). Hannaford-Agor's testimony was a general statement without any statistical analysis. The Court finds that her general statement does not constitute sufficient evidence that there is a causal link between the court practices and underrepresentations of persons who might be removed from the population of persons who might be contacted to serve on a jury.

(Footnote omitted).