**IN THE COURT OF APPEALS OF IOWA**

No. 23-1647
Filed March 5, 2025


**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**SAVION DEVONTE WILSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.


A criminal defendant appeals his conviction for first-degree murder.
**AFFIRMED.**


Jessica Donels of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Heard by Ahlers, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

It's undisputed Savion Wilson pointed a gun at Cortavius Benford's head, pulled the trigger, and killed him. The fight in this case was about whether the shooting was an accident or intentional. A jury did not believe Wilson's claim it was an accident and found him guilty of first-degree murder. Wilson appeals, claiming errors in jury selection, that there was not enough evidence supporting the verdict, and that the court erred in evidentiary rulings during trial. We find no reversible error and affirm.

## I. Background Facts and Proceedings

Witnesses agreed that Wilson and Benford had known each other a long time, their families were close, and they were friends. It was also largely undisputed that, about four months before the shooting, Wilson and Benford had a disagreement reflected in part by a social-media livestream in which Wilson recorded himself making statements about Benford. During the livestream, Wilson said he would "pop pop on ya niggas . . . one two three ding dong"; made statements like "come get him off the ground"; and referred to Benford's "life" as the marijuana blunt he was about to light. Benford's girlfriend understood all of these statements to be explicit or implicit threats of violence directed at Benford. And she explained at trial that Wilson and Benford had a bit of a falling out after this livestream and had only seen each a few times in the months between the stream and the shooting. Wilson's mother, who overheard Wilson recording the livestream, described Wilson and Benford as "arguing like two bitches." But she also thought they patched things up in the weeks that followed.

On the day of the shooting, Wilson, Benford, Benford's girlfriend, and a friend of Wilson were all hanging out at Benford's apartment. The group, other than Benford, was smoking marijuana. There were no overt signs of disagreement, and everyone but Benford went to get drinks and snacks at a nearby store. They went back to Benford's apartment after, and the group resumed hanging out—again seemingly without issue. But witness accounts diverge slightly about what happened in the moments leading up to Wilson shooting Benford less than an hour later.

According to Benford's girlfriend, Wilson left the apartment for a few minutes, then returned wearing a camouflaged mask he had on his head earlier in the day. In her words: "[Wilson] came in the front door. By the time I looked up from my phone, I had seen the gun pointed, and the gun went off within like three seconds after I had looked up." When asked about the specific sequence of events, she clarified that Wilson walked toward Benford, lifted the gun up, pointed it at Benford's head, and pulled the trigger—all in a matter of seconds. She also explained that she had chastised Wilson on other occasions for playing around with guns—like pointing one at her cat—because it was dangerous.

Wilson's friend agreed that Wilson left the apartment and added that Wilson pulled the gun out from under Benford's couch. He described Wilson "playing around with" the gun before eventually pointing it directly at Benford's head, pulling the trigger, and shooting him. Wilson's friend agreed that Wilson had a mask that day, but he wasn't sure if Wilson was wearing it when he shot Benford.

Wilson eventually turned himself in to police but claimed he didn't know where the gun was. He initially told detectives that both he and Benford were

playing with the gun that day and he didn't know which of them pulled the trigger. Wilson's story shifted at trial. He admitted that Benford never touched the gun that day. And he admitted that he pointed the gun at Benford's head and pulled the trigger. But he claimed the shooting was accidental, as he "was playing around with the gun," "pointed it everywhere," and didn't know it would fire when he pulled the trigger. Wilson also admitted to having a camouflaged mask the day of the shooting but said he wasn't wearing it when he fired the gun and killed Benford.

Witness accounts generally reconverged on what happened after the shooting. Wilson said something like, "what the fuck." Benford's girlfriend called 911, while Wilson and his friend fled the scene separately on foot. According to Wilson, he ran away with Benford's blood literally on his hands, and he ditched the mask somewhere outside while running.

When police performed a forensic extraction of Wilson's cell phone, they found videos of Wilson wearing the same clothing seen in surveillance footage from the store and a gun that appeared consistent with descriptions of the one he used to shoot Benford. Based on comparison of the gun in the videos to different manufacturers, police identified the model of the weapon and discovered it had two safeties—both a slide and a trigger. The phone extraction also revealed that Wilson had performed internet searches for "manslaughter sentence Iowa" and searched for news articles related to the shooting after he shot Benford.

An associate state medical examiner performed an autopsy. The cause of Benford's death was a single gunshot wound to the head and the manner of death was ruled homicide. The medical examiner ruled out suicide because the fatal gunshot was fired from at least three or four feet away and the position of the

gunshot entering Benford's head from above made it essentially impossible for Benford to have fired the shot.

In his trial testimony, Wilson disputed whether the statements in the livestream were threats. But he admitted the references to shooting someone—"pop pop"—were about Benford and another individual. In some tension with that admission, he also testified he did not "ever" think about killing Benford.

The jury found Wilson guilty of murder in the first degree, a class "A" felony in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2022). And the district court sentenced him to life in prison without parole. He appeals.

## II.    Discussion

Wilson's different claims—jury selection, sufficiency, evidentiary errors—carry different standards of review and some have embedded problems with preservation of error. We consider each separately.

### A.  Jury Selection

Wilson claims the district court erred when it denied his challenge to the State's use of peremptory strikes pursuant to *Batson v. Kentucky*, 476 U.S. 79, 96–97 (1986). We review this claim de novo, but with "great deference" to the credibility findings of the district court. *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990).

But first, we assess whether error was preserved, as we are a "court for the correction of errors at law"—not a court that typically decides issues in the first instance. Iowa Code § 602.5103(1). On appeal, Wilson contests the peremptory strikes used against prospective jurors 95 and 266. But he did not challenge the strike of prospective juror 95 below; in fact, in a subsequent argument regarding

prospective juror 266, he appears to have conceded striking 95 was appropriate or justified. After the State pointed out this preservation issue in its brief, Wilson filed a reply brief—but did not address the error-preservation deficiency in any way. We conclude any challenge to the State's strike of prospective juror 95 was not preserved,[1] and we review only the challenge to prospective juror 266.

"*Batson* holds that a defendant may establish a prima facie case of racial discrimination by showing that the prosecutor has exercised one or more peremptory challenges to remove from the venire members of a racial minority and that these facts and other relevant circumstances raise an inference of discrimination." *State v. Veal*, 930 N.W.2d 319, 332 (Iowa 2019) (discussing *Batson*, 476 U.S. at 96–98). "Such a showing shifts the burden to the prosecution to come forward with a race-neutral explanation for exercising the challenges." *Id.* As framed by the parties on appeal, the dispute is over whether the State offered a race-neutral reason for the strike and whether that reason was true or a pretext.

Prospective juror 266, like Wilson, was described as African American or black. In voir dire, 266 described himself as an "advocate of the Second Amendment," said he would look for "just anything in the case that could leave reasonable doubt," disagreed with the premises of some questions by prosecutors, and expressed that he would only convict in a hypothetical question if the evidence gave him "no choice" and he was "forced to believe it."

---

[1] Even if this challenge had been preserved, we would affirm. Prospective juror 95 twice said she did not believe she could be "fair." The district court correctly observed that it was "clear that there were race neutral reasons" for striking her, and Wilson's counsel made a similar observation.

Below, Wilson's attorney contended there was no race-neutral reason for the State exercising a peremptory strike on prospective juror 266. The assistant county attorney argued that 266 "appeared skeptical of essentially testimony," "seemed to want to make what I could character as excuses for individual[s'] conduct," and was "contrarian" in his repeated disagreement with prosecutors during voir dire. The district court credited the State's "position that [the prosecutors] felt that 266 was contrary to them" as "a race neutral reason" and denied the *Batson* challenge. And the court left the door open to revisit the issue if the State struck additional African American jurors. Neither party asked the court to revisit the issue.

We agree with the district court that striking a prospective juror due to the prospective juror's skepticism of testimony as evidence, tendency to offer excuses for culpable conduct, and disagreeable nature are race-neutral reasons under *Batson*. The transcribed record of prospective juror 266's statements is generally consistent with the assistant county attorney's recollection (and we recognize he had no transcript available to review at the time). We also defer to the district court's advantaged position to read the room rather than our review of the cold record. *See Veal*, 930 N.W.2d at 327 (emphasizing we give "a great deal of deference" to a trial court's determination of "the true motives of the attorney when making strikes" (citation omitted)). In our de novo review, informed by the court's credibility findings, we conclude the proffered reasons for striking prospective juror 266 were not a pretext for racial animus, and we affirm denial of the *Batson* challenge.

### B. Sufficiency of the Evidence

Wilson next contends there was insufficient evidence to support a first-degree murder conviction. We review for correction of errors at law. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted).

Wilson specifically contests the elements of malice aforethought, premeditation, and specific intent to kill. But the core of his complaint is simpler: he wishes the jury had believed his claim the shooting was an accident rather than the State's circumstantial case that he intended to kill Benford with malice. Yet, as we have held before, "A criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him[.]" *State v. Hernandez*, No. 23-0630, 2025 WL 52424, at *3 (Iowa Ct. App. Jan. 9, 2025) (en banc). Instead, like in most cases, the jury's determination of intent here "turned on resolution of competing inferences and implicit credibility findings"—and we are not empowered to substitute our view of the evidence for that of the jury. *State v. Howard*, 14 N.W.3d 763, 767 (Iowa Ct. App. 2024).

To the extent analysis on the individual elements is required beyond recognition of the jury's role deciding facts and credibility, we find the evidence sufficient to support the first-degree-murder conviction. The jury was entitled to reject Wilson's explanations and protestations regarding the livestream and instead believe he was angry with Benford and had threatened to "pop pop" or

shoot him. And the jury was similarly free to reject evidence that tensions between Wilson and Benford had cooled in the weeks leading up to the shooting. It is well-established that "prior threats" are probative on the intent accompanying future violence. *E.g.*, *State v. Rodriquez*, 636 N.W.2d 234, 242 (Iowa 2001). And the same goes for "bad feelings or quarrels between the defendant and the victim" as proof of malice aforethought or the motive accompanying premeditation. *E.g.*, *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003).

The jury was also permitted to infer both malice aforethought and specific intent to kill from Wilson's use of a dangerous weapon coupled with the opportunity to deliberate. *See State v. Green*, 896 N.W.2d 770, 779–82 (Iowa 2017) (surveying history and re-affirming use of this permissive inference). Pointing the gun at Benford's head and pulling the trigger—a version of events admitted by Wilson at trial—was sufficient to permit that inference, particularly in light of the gun's multiple safeties. And this evidence was reinforced by Wilson's shifting explanation for what happened, his internet searches following the shooting, and him fleeing the scene, all of which were substantive evidence of guilt. *See, e.g.*, *State v. Turner*, 630 N.W.2d 601, 609 (Iowa 2001) ("[C]onflicting statements about who did own the gun were another indication of guilt."); *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Admissions may be implied by the conduct of the defendant subsequent to a crime when such conduct indicates a consciousness of guilt."); *State v. Cox,* 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt . . . ."); *see also* Iowa R. Evid. 5.404(b)(2) (permitting otherwise improper character evidence to prove "lack of accident").

In the end, while it is possible a different jury could have believed Wilson's testimony and rejected the State's circumstantial mens rea evidence, this jury did not. Instead, the jury rejected Wilson's claim of accident and credited the prosecution's theory of murder. Substantial evidence, viewed in the light most favorable to the State and pursuant to longstanding case law, supports the verdict.

## C. Impeachment

Wilson next challenges the district court's evidentiary ruling prohibiting what he contends were two instances in which he sought to admit inconsistent statements made by Benford's girlfriend at trial. We analyze these statements separately. But we first consider the standard of review in the context of the precise challenge levied on appeal. Neither party's appellate brief relies on the hearsay rules—like Iowa Rule of Evidence 5.801(d)(1)(A) regulating prior inconsistent sworn statements—for admission of any of the statements at issue. Instead, the parties solely rely on Iowa Rule of Evidence 5.613, which regulates impeachment with unsworn statements. We follow the parties' briefing and solely review this issue under Rule 5.613 for an abuse of discretion. *See Bauer v. Cole*, 467 N.W.2d 221, 225 (Iowa 1991); *State v. Berry*, 549 N.W.2d 316, 319 (Iowa Ct. App. 1996).

### 1. The Deposition

The first piece of alleged impeachment evidence concerns a prior sworn statement by Benford's girlfriend in deposition. At trial, Wilson's attorney asked her: "[H]ad Cortavius [Benford] ever played around with guns?" Benford's girlfriend answered: "Not that I seen, no." Wilson's attorney then attempted to impeach her with reference to her deposition, but the State objected. Outside the presence of

the jury, Wilson's attorney then paraphrased the witness's statement in deposition that Benford "would mess around with guns but not after he got out," with Benford's attorney understanding "got out" as a reference to Benford leaving a correctional facility and beginning probation. The court ruled that this was not proper impeachment, given counsel's recitation that "she said the whole time she was with him she never saw [him playing with a gun], but before they were together maybe." The court added that, even if the statement was admissible for impeachment, the only way this witness would know what Benford did before they got together was hearsay, so it was inadmissible for a second independent reason. Wilson's attorney said he wasn't sure the witness only knew from hearsay but admitted that is what everyone inferred from the statement.

Iowa Rule of Evidence 5.613 allows for impeachment of witnesses by extrinsic evidence of a "prior inconsistent statement" on a material issue. *See* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.613:1 (Dec. 2024 update). Such an inconsistent statement is not offered as substantive evidence but instead merely as impeaching evidence to attack the credibility of the declarant. *See id.* This procedure is distinct and apart from admission of prior inconsistent sworn statements as substantive evidence under Rule 5.801(d)(1)(A). *See id.* & n.2 (collecting cases).

Contrary to what Wilson claims in his reply brief, the question of whether a statement is "inconsistent" for purposes of this rule does not rest with the jury—it instead rests with the district court. *See id.* § 5.613:2.

> The guiding definitions [for what is "inconsistent"] are general, requiring only that the prior statement be "inconsistent in material respects," "at material variance" with trial testimony, or that "[i]t is

enough if the [document], taken as a whole, either by what it says *or what it omits to say,* affords some presumption that the fact was different from defendant's testimony."

*Id.* (footnotes omitted). And, even after a proponent establishes a statement is inconsistent, the district court retains a gatekeeping function to decide whether to admit the evidence subject to other evidentiary concerns, including but not limited to the potential for unfair prejudice. *See United States v. Young*, 248 F.3d 260, 268 (4th Cir. 2001) (collecting cases that unanimously come to this conclusion for the comparable federal rule).

Here, Benford's girlfriend's statement that she had not "seen" Benford play with guns was not inconsistent with her prior statement that, before they had gotten together or before he had left the correctional facility, Benford played with guns. As a result, this prior statement was not admissible under Rule 5.613. And, as the State correctly notes in its brief, Wilson does not materially dispute this basis for the ruling in his own appellate papers. We affirm.

## 2. The Text Messages

The second alleged-impeachment challenge is more difficult to piece together from the record. At its core, Wilson wanted to admit a text message Benford's girlfriend sent Wilson, in which she said: "Bye, G, because you just lying to me. You put that shit up to his head playing, not knowing it wasn't on safety." The defense's offer of proof explaining the rationale for admitting this evidence became a bit disjointed, so we quote the argument rather than try to summarize it:

> [WILSON'S ATTORNEY]: I believe that as [Benford's girlfriend] sat there and testified here for the offer of proof, she had stated that at this point she does not believe that Mr. Wilson was playing around with the gun. However, she does acknowledge and admit that she had sent a text message to him indicating the

essentially opposite of that, that she was stating to him that she saw him playing around with the gun immediately after this happened. I do believe that's valid impeachment evidence. I believe during the offer of proof she essentially admitted that, so I do believe that we should be allowed and entitled to ask that question.

As pertinent to the issues on appeal, both the district court below and the State on appeal ascribe a different meaning to "playing" in "[y]ou put that shit up to his head playing" than Wilson and his attorneys—the district court and the State understood the statement to be speculation as to Wilson's mental state at the time he fired the gun—that he didn't mean to kill, but was just "playing." Given this (mis)understanding between the parties, the arguments were muddled below and are still discordant on appeal. But we focus narrowly on the district court's ruling to resolve the confusion.

This exchange concluded the discussion at trial:

> THE COURT: You're going to have to explain to me how what—what you read into the record as the text impeaches anything that [Benford's girlfriend] previously said. Because her previous testimony is she saw the person come in, she saw the person raise the gun not fully extended, half extended up to his head and shot. So what part of that text impeaches anything she said?
> [WILSON'S ATTORNEY]: Your Honor, I believe the question that I asked—and I don't remember specifically, but I believe what I asked that was objected to was "did you see [Wilson] playing around with a gun that day" or that was the intent after our discussion . . . .
> THE COURT: Okay. But you're messing up the facts of what happened and what she later presumed to be. What she testified about was that she had not seen the gun before it was extended and before [Benford] was shot. So if you're asking her if she saw [Wilson] playing with it that day, you can ask that.
> [cross-talk omitted]
> I think she's already testified that she did not see the gun before that. The text message, when you look at it, is her speculating about what [Wilson] did or did not know. . . .
> [WILSON'S ATTORNEY]: . . . . When she sends a text message immediately after stating that she saw [Wilson] put that shit up to his head playing, that is a clear statement that she saw him playing with the gun on that date.

THE COURT: No. That is her speculating that he was playing. It is not coming in. It's not.

We observe four things from this exchange: (1) the court recognized the confusion between the parties over the statement; (2) the court explained it did not find any inconsistency in the testimony as elicited; (3) as it stood, the court thought admitting the text message appeared to endorse speculation regarding Wilson's state of mind; and (4) the court gave directions for how Wilson's attorney could potentially open the door to admitting the text message if the court's understanding was incorrect. But Wilson's attorney never took the court up on its invitation.

We discern no error or abuse of discretion in how the court handled this confusing issue. We broadly share the district court's understanding that the text message did not appear to be inconsistent with any trial testimony elicited thus far. This interpretation is reinforced by the supporting clause that followed the use of "playing," in which Benford's girlfriend described Wilson as "not knowing it wasn't on safety." We find the court's suggestion that Wilson's attorney could lay foundation to potentially allow for admission of the text message was a reasonable one given the state of the record, and this was a fair way of addressing any lingering confusion. But we decline to hypothesize on how the issue might have been resolved if Wilson's attorney had laid the proper foundation. All this is a long way of saying there is no reversible error in how the district court navigated this issue by focusing on how Wilson had not yet elicited or identified testimony from Benford's girlfriend that contradicted the text message.

Last on this issue, we note a fleeting reference in Wilson's reply brief that appears to allege excluding this evidence may have violated his constitutional

rights.  This claim was not preserved below.  And it cannot be raised for the first time in a reply brief, even if it had been preserved.  *See, e.g.*, *Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992) ("[W]e have long held that an issue cannot be asserted for the first time in a reply brief.").  We do not consider it.

### D.  Images of Unknown People with Other Guns

Last, Wilson contends the district court erred in excluding four proposed defense exhibits that were images extracted from Benford's phone by police.  The proposed exhibits depict: an unknown individual licking part of a handgun; an individual standing with a gun on the floor nearby; a closeup of a hand holding a gun inside a building; and a closeup of a hand holding a gun with an extended magazine inside a vehicle.  Wilson did not affirmatively allege or prove any of the persons depicted in the photos were Benford but instead that they reflected Benford's "interest in guns or firearms," which Wilson argued supported his position that Benford handled the gun before or during the shooting.  The State clarified that, to the best of its knowledge, the photos came from applications like Snapchat or Pinterest—or at the very least there was no evidence Benford took the photos himself—and the defense did not dispute this characterization.  The court ruled the images were not relevant, emphasizing there was no evidence the images depicted Benford and did not appear to depict the gun at issue at trial.  But the court also left open the door that, if Wilson's attorney could establish a link to this case, the court would revisit the issue.  Wilson's attorney never linked the images to Benford beyond them being in Benford's cell-phone applications, at one point explaining: "I don't think the defense can hurdle over that additional burden

of connecting [the images] with depicting Mr. Benford, which is why we're not pursuing that line of questioning."

On appeal, Wilson reframes his argument on this evidence, claiming Benford's "interest in guns" was relevant to whether Wilson acted with malice aforethought and his mental state when he shot and killed Benford. He goes on to contend that the images supported his theory that he planned to "sell the gun to Mr. Benford and accidentally fired the fatal shot." So, as we understand it, Wilson is now arguing that, because Benford was interested in guns in the past, he was more likely to be interested in guns the day of the shooting, thus more likely to have handled the gun, and somehow it was then more likely that Wilson shot him accidentally rather than intentionally. The State counters that this argument "relies on wildly speculative propensity inferences" and the district court correctly exercised its discretion in excluding the evidence.

We affirm the district court. The bar for relevance is low. *State v. Thoren*, 970 N.W.2d 611, 622 (Iowa 2022). But not so low that it compels a district court to admit images found on a murder victim's cell-phone depicting other people handling other guns at unknown times and places. These images were not probative on any fact of consequence, and they were properly excluded under Iowa Rules of Evidence 5.401 and 5.402. To the extent Wilson's chain of propensity inferences was his true purpose in offering the evidence (rather than to sully Benford's character), it would also have been proper to exclude this evidence under Rule 5.404 as improper character evidence or Rule 5.403 as substantially more confusing and misleading to the jury than probative. For similar reasons, we also hold that exclusion of these images was harmless, as it had no bearing on the

evidence supporting Wilson's guilt and the inferences Wilson seeks to draw were not permitted by the rules of evidence.

### III.     Disposition

Having disposed of all claims properly preserved and raised before us on appeal, we affirm Wilson's conviction for first-degree murder.

**AFFIRMED.**